**COMMONWEALTH of Pennsylvania, Department of General Services, and Department of Revenue, Petitioners,**

v.

**ON–POINT TECHNOLOGY SYSTEMS, INC., Respondent.**

Commonwealth Court of Pennsylvania.

Argued Sept. 10, 2002.

Decided March 17, 2003.

Motion to Amend Judgment or Reargument Denied May 15, 2003.

Peter M. Good, Harrisburg, for petitioner.

Robert W. Hayes, Philadelphia, for respondent.

Before LEADBETTER, J., COHN, J., and KELLEY, Senior Judge.

OPINION BY Judge COHN.

This case arises from an order from the Board of Claims (Board) in which the Board found that Petitioners, Department of General Services (DGS) and Department of Revenue (Revenue) (collectively, the Commonwealth), had entered into a contract with Respondent, On–Point Technology Systems Inc. (On–Point), the terms of which the Commonwealth breached. Based upon this breach, the Board awarded On–Point expectation and reliance damages in the amount of $4,528,049.52 plus interest. The Commonwealth appeals this order, arguing that the parties had not formed a contract, but were merely in the process of negotiating a contract. In this appeal, we must decide whether, under the terms of a request for proposal (RFP), a binding contract was formed after On–Point had been identified as the winning bidder, but before a signed contract was executed. For the reasons that follow, we find that no contract was formed. Accordingly, we reverse the decision of the Board as to the finding of a contract and as to the award of damages under the purported 1995 agreement.

The following facts are pertinent. Revenue is an administrative agency of the Commonwealth of Pennsylvania with authority to administer the State Lottery (Lottery). In May 1995, Revenue formed a Selection Committee, which was responsible for reviewing an RFP prepared by Lottery officials, which specified the type and nature of the instant ticket vending machines (ITVMs) for Revenue to procure. The RFP described, in detail, the standards to which responsive proposals must be prepared, set forth the procedure by which the Commonwealth would evaluate proposals, described how the RFP process would be conducted, posed numerous questions concerning pricing, warranties, maintenance and delivery, and contained a draft form of a contract the successful bidder would be required to execute.[1] The RFP contained several provisions of particular interest for resolution of the instant case. Paragraph 5, which had the heading "Standard Contract," read:

Negotiations will be undertaken with the responsible Vendor whose responsive proposal best meets the needs of the Commonwealth in terms of the requirements of this RFP. These negotiations with the Commonwealth will result in a formal contract between the parties.

(RFP ¶ I–5 at pg I–2).[2] This same provision also indicated that:

If, in the opinion of the Commonwealth, contract negotiations with the selected Vendor cannot be concluded within thirty (30) days following the selected Vendor's receipt of a draft contract, the Commonwealth may in its discretion, immediately discontinue negotiations with the selected Vendor and commence negotiations with the remaining Vendor(s) who received the next highest number of evaluation points.

(RFP ¶ I–5 at pg I–2). Additionally, paragraph I–4 of the RFP indicated that

Issuance of this RFP in no way constitutes a commitment by the Commonwealth to award a contract. **The Commonwealth reserves the right to** reject any or all proposals or to **cancel this RFP if it is in the best interest of the Commonwealth.**

(RFP ¶ I–4 at page I–2) (emphasis added). The RFP also contained a provision as to the incurring of costs, noting that:

The Commonwealth is not liable for the payment of any amounts to the selected Vendor until a contract is negotiated, signed by the Vendor, and all Commonwealth signatures, as required by law, have been obtained.

(RFP ¶ I–6 at page I–2).

The RFP was approved by the Executive Director of the Lottery, Charles Kline, and then Secretary of Revenue, Robert A. Judge (Secretary), along with DGS, the Commonwealth agency responsible for acting as purchasing agent for the Commonwealth's administrative agencies. In August 1995, Revenue, acting through DGS, issued the RFP.

Two companies, On–Point[3] and Interlott provided the only responses, with On–

1. The RFP described different types of ITVMs that the Lottery was, potentially, interested in purchasing. Prospective vendors were asked to include prices for each of the types of ITVMs described in the RFP.

2. As discussed below, much of On–Point's argument, as to the establishment of a contract, centers on the word "will" contained in the last segment of the quoted paragraph.

3. On–Point, a Nevada corporation, had already provided the Commonwealth with ITVMs under a 1993 contract. In 1993, On–Point entered into a contract with Revenue to supply and service 1000 ITVMs. Revenue agreed to pay On–Point in advance for its maintenance services, paying a fee of between $37 and $40 per month per machine. The service agreement was for a three-year term

Point submitting two alternative proposals and Interlott submitting one proposal. The RFP Committee reviewed the responses and, after applying an objective scoring mechanism, ranked both of On–Point's proposals higher than the Interlott proposal. The Secretary reviewed and approved the selection of On–Point as the provider for the additional machines, as did George C. Fields, DGS Deputy Secretary for Procurement. On December 13, 1995, the Secretary sent a letter to On–Point informing it that its proposal was the most responsive to the Commonwealth's RFP. The second paragraph of the letter stated:

This letter is to be considered a letter of intent to enter into contract negotiations. Be advised, however, that this letter is not binding in any way nor will the Commonwealth be bound until a formal contract has been negotiated and authenticated by all required signatures.

(Letter of Robert A. Judge, Sr., Secretary of Revenue, to Catherine Winchester of Lottery Enterprises, Inc., December 13, 1995).[4]

Shortly thereafter, Julia Sheridan, Deputy Chief Counsel for Revenue, provided a proposed form of contract to On–Point. The contract did not include any quantity[5] or price terms.[6] On–Point representatives reviewed the proposed contracted, offered some comments, and returned the proposed agreement to Ms. Sheridan. On–Point received no further response regarding the agreement. The parties never signed a contract.

On July 25, 1996, the Secretary of Revenue notified On–Point that Revenue had cancelled the 1995 RFP, noting that "the RFP, as originally formulated, did not generate responses satisfactory to accomplish the goals of the Department. For that reason, I believe it is in the best interest of the Commonwealth to cancel the RFP."[7]

running from April 1, 1993 through March 31, 1996. Revenue could extend the original term of the 1993 contract for two additional terms of one year each, upon terms and conditions mutually agreed upon by Revenue and On–Point, and could also order an additional 200 ITVMs. On–Point began supplying the machines in September 1993.

Within several months, Revenue ordered all 1000 machines called for in the contract. Shortly thereafter, within the first year of the contract, Revenue executed a first amendment to the 1993 agreement, in which Revenue ordered the additional 200 ITVMs allowed by the 1993 Contract. Because the Lottery had ordered all the ITVMs contracted for under the 1993 contract, it began the RFP process that is the subject of the instant case, in order to procure additional ITVMs. However, in February 1996, Revenue asked On–Point to extend, by one additional year, the service agreement from the 1993 contract. On–Point agreed to this extension.

4. Lottery Enterprises, Inc. was the predecessor corporation to On–Point.

5. The draft contract did not indicate either the overall number of machines that would be

involved in the purchase, nor the specific number of each type of ITVM the Lottery would purchase. For that matter, the draft contract contained no indication as to the types of ITVMs that the Lottery would purchase. Also, the contract did not include a date for delivery of any of the ITVMs.

6. The proposals submitted by On–Point did include price terms for each particular type of ITVM that the Lottery sought bids for. The prices varied between ITVM models depending on the size and number and types of features that came with each specific model.

7. The Board, in its decision in this case, also discussed communications that took place between Commonwealth and Interlott officials. In January 1996, Interlott sent several letters to the Commonwealth, which raised an issue as to On–Point's financial stability. The Commonwealth, by Mr. Charles Kline, the Lottery's Executive Director, declined to meet with Interlott on this issue, since it exceeded the scope of the debriefing as described in the RFP. However, the Secretary Judge overruled Mr. Kline, and lottery personnel met with Interlott representatives and their coun-

Consequently, no contract was awarded to any party under the 1995 RFP.

◼ On September 13, 1996, On–Point filed a complaint with the Board, asserting a breach of the contract, allegedly formed in 1995, to deliver and service up to 5000 ITVMs.[8] Several days of hearing were conducted in April 2001. On March 21, 2002, the Board ruled in favor of On–Point, awarding $932,507.52 in reliance damages (for inventory accumulated to fulfill the

contract), $1,851,000 for lost profits from sales of machines under the 1995 contract, and $1,615,000 for loss of profits from service of the machines. The Board also awarded damages arising from the 1993 contract.

In reaching this decision, the Board determined that a contract arose from the 1995 RFP process when the Secretary approved the selection of On–Point under the RFP, and then communicated this decision to On–Point in the December letter.[9] The

---

sel. Mr. Kline informed Secretary Judge that he took Interlott's allegations seriously.

8. On–Point also pled a cause of action for breach of contract to service the machines that arose from a 1993 contract On–Point had with the Commonwealth. The Commonwealth, in its brief and arguments before this Court, does not specifically contest the validity of this 1993 agreement, nor does it specifically contest the damages awarded by the Board in relation to this agreement. Accordingly, we deem any argument as to the validity of the Board's decision relating to this 1993 contract to have been waived.

9. Applicable provisions of the Board Decision read:

2. On August 28, 1995, the Commonwealth, acting through the Department of General Services issued a Request for Proposal (hereinafter referred to as "RFP") and is bound to comply with the procedures set forth in the RFP.

3. The Commonwealth is required to act in good faith with proposers giving every proposer equal access to the Commonwealth and is not to provide one proposer greater access than another proposer.

4. The RFP constituted an offer to participate in the(?)contract forming process to be conducted in the manner set forth in the RFP.

5. On–Point's proposal in response to the 1995 RFP constitutes a valid offer.

6. The Commonwealth's December 13, 1995 letter communicated the Commonwealth's acceptance of On–Point's offer.

7. The acceptance of the On–Point proposal entitled On–Point to finalize the purchase and sale with the Commonwealth without interference from outside parties.

8. The Commonwealth and On–Point reached agreement on the essential terms concerning the purchase and maintenance of the ITVMs.

9. A contract existed between On–Point and the Commonwealth as there was an offer, acceptance, consideration and mutual meeting of the minds.

10. The procurement regulations set forth in the Guide for Procurement of Automated Technology Resources by the RFP process expressly state that all proposals must be kept confidential in order to avoid "[a]ttempts to influence the agency head's decision by outside parties.

\* \* \* \*

12. Under Pennsylvania law, an agreement to negotiate in good faith is enforceable.

13. By expressly stating in the RFP that the Commonwealth would enter into contract negotiations with the most responsive vendor and by communicating its "intent to enter into contract negotiations," the Commonwealth undertook an obligation to do so.

14. The Commonwealth breached its procurement obligations when its representatives met with Interlott and permitted Interlott to challenge On–Point's financial status.

15. The meetings between the Commonwealth and Interlott violated the express provisions of the RFP because the meetings were solely for the purpose of discussing the ability of On–Point to perform under the contract.

16. Commonwealth breached its obligation to negotiate with On–Point in good faith.

\* \* \* \*

18. The 1995 RFP and response was a binding contract between On–Point and the

Board found that the December letter resulted in a contract to carry out negotiations in good faith that was breached. The Board supported this position under Section I-5 of the RFP, which provided that "[n]egotiations will be undertaken [and that] [t]hese negotiations ... will result in a formal contract." In its opinion it read the term "will" as showing that "the Commonwealth intended to accept the proposer as the contract vendor under the essential terms set forth in the RFP and proposal." (Board Opinion, March 21, 2002, at 28.) The Board also noted the testimony of Secretary Judge, who stated that the Commonwealth had agreed to purchase ITVMs from On-Point and that all that remained was to "work out ... using their equipment for sale of lottery tickets" and what remained was simply establishing a delivery schedule, as well as the final number of machines. (Board Opinion, March 21, 2002, at 28 (quoting from Notes of Testimony before the Board (N.T.) at 913)).[10] As such, the Board concluded that the parties had agreed to the essential terms of the contract. The Board based its decision on the Supreme Court's analysis in *Shovel Transfer and Storage, Inc. v. Pennsylvania Liquor Control Board,* 559 Pa. 56, 739 A.2d 133 (1999), and concluded that:

> When the Commonwealth sent On-Point its letter of December 13, 1995, notifying On-Point that it was the successful proposer, the Commonwealth bound itself to deal with On-Point, as opposed to any other vendors, and to do so in good faith.

The Commonwealth contends these obligations did not exist as there was no contract. This Board is of the contrary opinion. After hearing the witnesses, seeing the evidence and assessing the credibility of the witnesses, this Board is of the opinion that not only did the Commonwealth violate its duty of good faith and fair dealing with On-Point, it did in fact breach a contract that the parties had reached.

(Board Opinion, March 21, 2002, at 26). The Commonwealth appealed this decision.

Before this Court, the Commonwealth raises four issues: (1) whether the Board committed an error in finding a contract between the parties; (2) whether the Board committed an error by awarding damages; (3) whether the Board committed an error of law by refusing to take judicial notice of a ruling of the United States District Court for the Southern District of Ohio; and (4) whether the Board committed an error of law by allowing On-Point to read deposition testimony of several Commonwealth witnesses despite the presence of those witnesses in the courtroom at the time of the reading. As discussed below, our decision as to the first two issues renders it unnecessary to address the last two issues.

In reviewing a decision of the Board, this Court's standard of review is "limited to a determination of whether constitutional rights were violated, whether an error of law was committed, and whether necessary findings of fact were supported by substantial evidence." *Shovel Transfer,*

---

Commonwealth as signatures were not a condition to the formation of the contract. (Board Opinion, March 21, 2002, Conclusions of Law at 16 17).

**10.** The Secretary Judge, when questioned regarding what items were still negotiable, answered: "Price, Service, what type of equip-

ment we would bring in. There were various types of machines available. At that time, I believe, they were 4, 8, and 12 bin operational pieces of equipment. So it was to negotiate the discussion of what type of equipment would best serve the Pennsylvania Lottery." (N.T. at 913–14.)

559 Pa. at 62, 739 A.2d at 136 (1999) (citation omitted).

The Commonwealth contests the Board's finding that there was a contract, arguing that the Board misapplied the precedent of *Shovel Transfer*.[11] In response, On–Point argues that the Board appropriately interpreted and applied the *Shovel Transfer* case and that there was substantial evidence to support the decision. Since both parties contend that *Shovel Transfer* determines the outcome of this case, we begin our analysis of this issue by reviewing the *Shovel Transfer* decision.

In *Shovel Transfer*, the Supreme Court addressed the issue of whether signatures were necessary to form a valid and enforceable contract between a private party and a government entity. The case involved a purported contract between the Pennsylvania Liquor Control Board (LCB) and Shovel Transfer and Storage Company, a warehouse and distribution facility. Shovel Transfer had entered into an agreement to purchase a warehouse in Pittsburgh that would be used as a distribution facility for the LCB. The sales agreement had a contingency clause that allowed Shovel Transfer to withdraw from the sales agreement in the event that it was unable to enter into a contract with the LCB. During the process of negotiations with the LCB, Shovel Transfer, on three separate occasions, executed amendments to the sales agreement to extend the period of time in which to finalize the purchase of the warehouse.

The LCB approved negotiations with Shovel Transfer for the contract to store and distribute goods at the new warehouse and, later, sent an unsigned contract. Shovel Transfer officials signed the contract and returned the executed agreement to the LCB. Both the Attorney General

and the Chairman for the LCB signed the contract. Shortly thereafter, Shovel executed a final agreement of sale for the warehouse.

Subsequent to Shovel's purchase of the warehouse, Secretary of the Budget and the LCB Comptroller refused to sign the contract. One year later, a new RFP was issued for the distribution project and the contract was, subsequently, awarded to a third party. In response, Shovel Transfer initiated a breach of contract action against the Commonwealth. After reviewing Shovel Transfer's claim, the Board determined that the parties had not entered into an enforceable agreement. On appeal, this Court affirmed the Board's decision.

On further appeal, the Pennsylvania Supreme Court reversed agreeing with Shovel that the signatures of the Comptroller and Budget Secretary were not necessary. In doing so, the Court stated that:

> The law of this Commonwealth makes clear that a contract is created where there is mutual assent to the terms of a contract by the parties with the capacity to contract. . . . "If the parties agree upon essential terms and intend them to be binding, 'a contract is formed even though they intend to adopt a formal document with additional terms at a later date.'" . . . As a general rule, signatures are not required unless such signing is expressly required by law or by the intent of the parties. . . . Pennsylvania Law Encyclopedia, Contracts § 29. Where the elements for the formation of a contract are prescribed by statute, then the contract is not enforceable until the statutory requirements are met. Thus, the first inquiry is whether the signatures were required by statute.

11. Second, the Commonwealth argues that the record does not contain substantial evidence to support the Board's determination that there was a contract.

*Shovel Transfer*, 559 Pa. at 62–63, 739 A.2d at 136 (citations omitted). In turning to the statutes, the Court examined the Liquor Code, Act of April 12, 1951, P.L. 90, *as amended*, 47 P.S. §§ 1–101–9–902, and determined that the LCB was an independent agency with exclusive authority to enter into contracts; "the Liquor Code does not delegate any authority for contracting to the Governor." *Id.* at 63, 739 A.2d at 137. The Court also noted that although contracts for services generally require the signature of the Budget Secretary, in accordance with 4 Pa.Code. § 1.332(a)-(b), an exception exists for sole source procurement of service contracts. The Court noted that, for such contracts, approval was only needed from the agency head. As such, there was no statutory requirement for a signature from the Budget Secretary or the Comptroller.

Significant for the instant case, the Court noted that, although there was no statutory requirement for the signatures of the Budget Secretary or Comptroller, such signatures could still have been required if that were the intent of the parties. In assessing the parties' intent, the Court reviewed the record and, contrary to the findings of the Board and the view of this Court, concluded that the record did support the conclusion "that the parties intended to be bound under the terms of the contract regardless of the execution of all signatories." *Id.* at 66, 739 A.2d at 138. In support of this conclusion, the Court noted that Shovel had executed several amendments to the contract of sale in order to allow for more time, such that closing would take place only after securing a contract with the LCB. The Court further noted that it was only after both Shovel and LCB officials had signed the contract that Shovel proceeded to close on the purchase of the warehouse. Of particular relevance for the instant case, the Supreme Court, citing to *Franklin Interiors v. Wall of Fame Management Co., Inc.*, 510 Pa. 597, 511 A.2d 761 (1986), also noted that the LCB "could have included a term in the contract that would have expressly provided that an enforceable contract would not exist until all the signatures were fixed to the contract."

 In the instant case, Revenue **did** include such limiting language within the proposed Contract. Specifically, immediately above the signature lines in the sample contract that had been sent to On-Point, was the following paragraph:

> IN WITNESS WHEREOF, the Parties to this Contract have executed it through their respective duly authorized officers, to be effective as of the date first above written. **This Contract will not be fully executed and binding on the Parties unless and until all signatures are affixed hereto.**

(Draft Contract for Purchase of Instant Vending Machines between Department of Revenue, Pennsylvania State Lottery and Lottery Enterprises, Inc. at 3) (emphasis added). The December 1995 letter from the Secretary of Revenue to On–Point reiterated this principle. More importantly, unlike in *Shovel Transfer*, where the contract at issue had been signed by representatives of both the seller and the agency buyer, the instant contract contained **no signatures** from either the seller or the buyer. Furthermore, unlike the agreement in Shovel Transfer, the draft form agreement at issue did not contain all of the necessary terms.[12] Under these cir-

---

12. As stated by our Supreme Court in *Lombardo v. Gasparini Excavating Co.*, 385 Pa. 388, 393, 123 A.2d 663, 666 (1956), "in order for there to be an enforceable contract, the nature and extent of its obligation must be certain; the parties themselves must agree upon the material and necessary details of the bargain." *Id.* (finding no contract because

cumstances, the Board's legal determination that a contract had been formed, was in error.

■ We disagree with On–Point's argument that a binding contract was formed by the language in Paragraph 5 of the RFP that negotiations *would* lead to a contract. Reading the RFP provisions *in toto,* this language merely indicates that the successful bidder and the Commonwealth will enter into negotiations, the goal of which will be the execution of a formal contract.[13] We note that the RFP describes at least two instances in which such negotiations will not result in a contract. For example, language in Paragraph 5 notes that the Commonwealth may "in its discretion," cease negotiations "if in the opinion of the Commonwealth" negotiations with the winning bidder will not conclude within a specific period of time. A second example arises from language in Paragraph 4 that "The Commonwealth re-

serves the right to reject any or all proposals or to cancel this RFP if it is in the best interest of the Commonwealth." Additionally, the prefatory language in Paragraph 4 clearly indicates that the "[i]ssuance of this RFP in no way constitutes a commitment by the Commonwealth to award a contract." Indeed, pursuant to Paragraph 4, the Commonwealth exercised its right when it cancelled the RFP in July of 1996. As noted in the Restatement (Second) of Contracts, § 26:

> A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent.

These provisions clearly demonstrated that subsequent manifestations of assent were prime requisites to the formation of a contract.

---

purported terms were too vague because they lacked discussion of time and manner of performance, as well as the price to be paid). The instant purported contract lacked these same terms. Nowhere, in any of the contract documents, are the price, quantity or time of delivery terms definitively given. The RFP indicated that the Commonwealth would purchase a minimum number of machines (1000), but no document indicated what specific types of ITVMs would be purchased. In concluding that the parties had agreed to the material terms of the contract, the Board erred as a matter of law.

13. *Cf. Crouse, Inc. v. Braddock Borough School District,* 341 Pa. 497, 19 A.2d 843 (1941); *NVC Computer Sales, Inc. v. Philadelphia,* 695 A.2d 933 (Pa.Cmwlth.1997), *petition for allowance of appeal denied,* 550 Pa. 711, 705 A.2d 1312 (1997). In *Crouse,* our Supreme Court, in applying a statutory requirement that acceptance of a proposal, issued in response to public bid request, required formal execution before a contract was formed, stated:

> When a municipal body advertises for bids for public work and receives what ap-

pears to be a satisfactory bid, it is within the contemplation of both bidder and acceptor that no contractual relation shall arise therefrom until a written contract embodying all material terms of the offer and acceptance has been formally entered into. *Crouse,* 341 Pa. at 500, 19 A.2d at 844; *accord NVC Computer Sales.* Just as statutory language can indicate to a potential vendor that a contract would not be formed until its terms are memorialized in writing and that writing is formally executed by all the parties, such an expectation can also be created by the language of the proposal requests and contract language itself. *See* 1 Richard A. Lord, *Williston on Contracts* § 4:10, at 343–44 (4th ed. 1990) ("In the case of public contracts, certain additional formalities are often required by statute or by the request for bids under such statutes, such as the execution of a written contract, or the requirement that a satisfactory bond be furnished. In such cases, even after acceptance of the bid has occurred, no contract is formed until the requisite formality has been complied with.")

The Commonwealth's second issue raised on appeal addresses the award of damages. As noted above, the Board awarded On–Point expectation reliance damages, both with interest, for the breach of the purported 1995 contract. It also awarded damages arising from the 1993 contract.[14]

The issue of damages arising from the existing contract formed in 1993 was appropriately before the Board and the damages awarded were not challenged on appeal. However, regarding the purported 1995 contract, our legal determination that there was no contract precludes the Board's award of expectation and reliance damages as a result of the 1995 RFP process.[15] Like the Board, we are also disturbed that the Commonwealth engaged in discussions with Interlott that arguably exceeded the scope of debriefing as permitted under the RFP. However, this purported lack of "good faith" does not permit us to find that a contract existed in the absence of the requirements as discussed above.

Given our determination as to the Board's first two issues, we need not reach the remaining two issues. Accordingly, the order of the Board is affirmed as to the damages awarded pursuant to the 1993 contract, but reversed as to all additional damages.

### ORDER

**NOW,** March 17, 2003, the order of the Board of Claims in the above-captioned matter is affirmed as to the damages awarded pursuant to the 1993 contract, but reversed as to all additional damages.

---

**14.** As previously noted, neither side contests the existence of the separate 1993 contract. There is no question that the claims arising therefrom were properly before the Board and that the Board had jurisdiction to review the claims and award an appropriate remedy as to them.

**15.** The Restatement (Second) of Contracts § 344 defines expectation interest as the "interest in having the benefit of his bargain by being put in as good a position as he would have been in had the *contract* been performed." (Emphasis added.) As the breach occurred prior to the formation of a contract, there is no basis for awarding On–Point the benefit of the bargain.

The Restatement (Second) of Contracts § 344 defines reliance damages as the "interest in being reimbursed for loss caused by reliance on the *contract* by being put in as good a position as he would have been in had the contract not been made." (Emphasis added.) The Board awarded reliance damages premised on the finding of a contract between the parties. Our conclusion that there was no contract eviscerates the foundation used by the Board in awarding reliance damages.

We note, additionally, that although the "equity jurisdiction of the Board extends to all cases instituted in the form of contract actions, namely quasi-contract claims and claims in *quantum meruit,*" *Miller v. Department of Environmental Resources,* 133 Pa. Cmwlth. 327, 578 A.2d 550, 553 (1990), *petition for allowance of appeal denied,* 526 Pa. 643, 584 A.2d 324 (1990), the only claim raised went to the existence of a contract arising from the RFP process. No implied contract or *quantum meruit* arguments were made or briefed. As neither the parties, nor the Board, addressed such arguments, we decline to do so here. Therefore, any claims for reliance damages that may have arisen from an implied law contract or *quantum meruit* (*see, e.g.,* Restatement (Second) of Contracts § 90), were waived.