**AMERICAN EAGLE OUTFITTERS, Retail Royalty Company, Appellees,**

v.

**LYLE & SCOTT LIMITED; Harris Watson Investment Limited, Appellants.**

No. 08–4807.

United States Court of Appeals, Third Circuit.

Argued May 21, 2009.

Opinion Filed: Sept. 11, 2009.

Emily J. Barnhart, Esq., Dennis P. McCooe, Esq., Timothy D. Pecsenye, Esq., Laurence S. Shtasel, Esq., James T. Smith, Esq., Marc E. Weitzman, Esq., Blank Rome, Philadelphia, PA, Susan B. Flohr, Esq., Blank Rome, Charles R. Wolfe, Esq., Blank Rome, Washington, DC, Robert L. Byer, Esq. [Argued], Susan G. Schwochau, Esq., Duane Morris, Pittsburgh, PA, for Appellants.

Clay P. Hughes, Esq., Cynthia E. Kernick, Esq., Walter T. McGough, Jr., Esq. [Argued], Kirsten R. Rydstrom, Esq., Richard T. Ting, Esq., Colin E. Wrabley, Esq., Reed Smith, Pittsburgh, PA, Theodore R. Remaklus, Esq., Wood, Herron & Evans, Cincinnati, OH, for Appellees.

Before: FUENTES, JORDAN, and NYGAARD, Circuit Judges.

## OPINION OF THE COURT

FUENTES, Circuit Judge.

This is a contract case arising from the parties' efforts to resolve a dispute over their use of similar trademarks in their respective clothing lines. To work out an acceptable business arrangement, representatives of American Eagle Outfitters ("American Eagle" or "AE") and Lyle and Scott, Ltd. ("Lyle & Scott" or "LS") met in London in January 2006. During this meeting, the parties drew up an informal document (the "London Memorandum") memorializing the content of their discussion and their points of agreement. The dispute in this case centers on the significance of this London Memorandum. The Magistrate Judge[1] agreed with Plaintiff–Appellee American Eagle that the London Memorandum was a binding contract between the parties, and that its terms were not ambiguous, holding that no reasonable jury could find otherwise. Defendant–Appellant Lyle & Scott appeals, arguing that the parties did not intend to contract, and even if they did, the contract that resulted was too indefinite to be enforceable.

---

1. The parties consented to have a magistrate judge hear the case pursuant to 28 U.S.C. § 636(c).

For the reasons outlined below, we agree with the Magistrate Judge that the parties formed an enforceable contract, but we disagree with her finding that all of its terms are unambiguous. Accordingly, we remand the case so that a jury may interpret the contract's more ambiguous terms.

## I.

American Eagle is an American clothing retailer. It operates in all fifty states, the District of Columbia, and Puerto Rico, and has internet sales in twenty-four foreign countries. Lyle & Scott is a British sportswear manufacturer and is owned by Waterlinks Investment Ltd. At the start of this litigation, Waterlinks Investment Ltd. was known as Harris Watson Investments Limited ("HW") after its principals, John Harris and Sue Watson. Harris and Watson control Waterlinks Investment Ltd., as they did HW. For the purposes of this Opinion, the two companies can be used interchangeably.

The dispute at the center of this case began in September 2005. Benjamin Sharpe, the managing director of Lyle & Scott, wrote to American Eagle's CEO, James O'Donnell, stating that American Eagle's use of its eagle logo was uncomfortably close to Lyle & Scott's own "birdie" trademark. Sharpe opined that "there is a substantial risk of confusion as to the origin of your goods when offered for sale in Europe ... [and] we would undoubtedly succeed in infringement proceedings against you." (App.142–43.) Sharpe then invited American Eagle to respond with suggestions on how to move forward.

In December 2005, a few months after Sharpe sent the letter to American Eagle's CEO (and following some other correspondence between Lyle & Scott and American Eagle), Kimberly Strohm, the in-house counsel for American Eagle, wrote Dennis Hall, HW's corporate development director, proposing a face-to-face meeting to work out an acceptable business solution. Sharpe had previously asked Hall to handle the dispute with American Eagle. According to Sharpe's testimony, Hall was not directed to report back to Sharpe or anyone else, and appears to have been given wide latitude to resolve the situation. Sharpe had delegated other trademark matters to Hall in the past, with Hall signing documents on behalf of Lyle & Scott during those negotiations, although those matters were smaller and less complicated than the dispute with American Eagle.

In January 2006, Strohm met with Hall in London, and brought along Christopher Fiore, American Eagle's senior VP in charge of "International." Strohm told Hall in a December 21, 2005, email that she would be attending the meeting as part of the management team, and that the meeting would be "business person to business person," although outside legal counsel would be available if necessary. (App.162.) Strohm made explicit her understanding that Lyle & Scott's attorneys would play a similar role—they would be on hand if necessary, but not in the negotiating room. The emails exchanged between Hall and Strohm outlining these parameters contained the language "without prejudice," and Strohm proposed that the meeting be conducted "without prejudice."

The meeting stretched over a morning and an afternoon session. During the morning session, Hall pushed Strohm to abandon American Eagle's use of the logo, but Strohm resisted. She instead proposed a coexistence agreement whereby both companies would use the logo along with safeguards to avoid customer confusion. During the break between sessions, Hall telephoned Harris, one of the HW

principals, and discussed the available options, all the while recording notes of Harris's preferences. Hall and Strohm then reconvened for the afternoon session.

At the end of the afternoon session, Strohm and Hall drew up an informal document memorializing the points upon which the two parties had agreed (the aforementioned London Memorandum). The memorandum read:

AE to pay $1,000,000 (US) to Lyle & Scott.

Parties agree as follows:

- AE to use its current eagle on American Eagle branded merchandise, products must also bear American Eagle or American Eagle Outfitters on the label;

- AE to sell products in AE stores, stores within stores or AE website;

- LS to use its eagle designs on Lyle & Scott branded merchandise, products must also bear Lyle & Scott on the label;

- Perpetual and worldwide pertaining to goods of LS registrations

- AE shall have the right of first refusal to purchase LS eagle(s) or business

- Each party shall consent to the registration of the other's eagles and AE shall withdraw its opposition against LS application in the US

- Each side to bear their own government taxes

- AE to pay the reasonable and customary atty fees of LS

2. In a subsequent email, Hall noted the following: "When we came to an agreement and you were proposing to revert subsequently with outline terms, I suggested we set them out in writing then and there." (App.644.)

3. Hall claims that he left the meeting with the understanding that the agreement would not

- AE will not launch or offer a specific range targeted at the golf market
- AE will discuss with LS [sourcing of] garments

(App.170–71.) Hall acknowledged that it was he who suggested the list should be put in writing.[2] Hall then asked Strohm if they should both sign the document, but Strohm replied that signing would not be necessary.[3] Strohm and Hall each left the meeting with copies of the London Memorandum and Strohm agreed to turn it into a formal document. The London Memorandum, unlike the emails exchanged between Strohm and Hall, did not contain the "without prejudice" language.

On January 23, 2006, two weeks after the London meeting, Strohm sent Hall a "draft of the co-existence agreement" ("draft agreement"). Hall responded three days later with an edited version. Hall stated that his edits were generally "simple tidying." There was one portion, however, where Hall acknowledged he was making a substantive edit. Section 3(a)(iv) had stated "AEO can register its AEO Eagle Design marks for goods and services throughout the world." Hall deleted "throughout the world" and substituted "in the U.S." The accompanying email stated the following:

I believe my comments are simple tidying other than clause 3(a)(iv)—we do not want to allow you to register outside your core market, naturally we will not object to your internet selling activities and we will defend our mark (and by similarity, your mark) in these other territories. This allows you to trade

become effective until a formal document was generated and the relevant parties signed on. Strohm and Fiore, on the other hand, testified that Hall shook hands and said something to the effect of "we have a deal," leading them to believe that they had a formal agreement.

unfettered whilst not diminishing our prior rights in these other territories. (App.184.) The portions of the London Memorandum that generated this disagreement, clauses four and six, read as follows:

> Perpetual and worldwide pertaining to goods of LS registrations
>
> . . .
>
> Each party shall consent to the registration of the other's eagles and AE shall withdraw its opposition against LS application in the US.

(App.170.)

On January 31, 2006, Hall and Strohm exchanged emails discussing Strohm's concern over Hall's statement that Lyle & Scott did not want to let American Eagle register outside American Eagle's core market. They agreed to hold a conference call the next morning. Shortly before the call, however, Hall emailed Strohm to flag another problem. The email stated:

> I need to clarify one issue ahead of our conversation. . . . As a result you may well think I am moving our position! After discussions on our licensee relationships, we now have significant issues in allowing you to trade into territories outside America. This is particularly important in Europe and the Far East where we have clearly established marks and prior rights.

(App.196.) Hall then proposed "two measures": that American Eagle change the colors/embroidery of its logos and that American Eagle pay Lyle & Scott a royalty fee of five percent on sales made in territories where Lyle & Scott had established its marks. (App.196) In flagging this problem and proposing solutions, Hall noted that he understood that this "contradict[ed] the worldwide basis [American Eagle] sought to achieve at [the] meeting." This proposal also contradicted Hall's January 26 email, in which he stated that Lyle & Scott would not seek to restrict American Eagle from selling over the internet. (*See* App. 184 ("[N]aturally we will not object to your internet selling activities.").) More telephone calls followed, but no settlement was reached.

On February 10, 2006, Hall emailed Strohm to reiterate Lyle & Scott's position, again emphasizing that American Eagle would not be permitted to register its mark in places where Lyle & Scott had prior rights. He further stated that he understood clause six to limit American Eagle's registration to the United States. (App.644.) On March 3, 2006, Hall sent another email, again stating that Lyle & Scott would not consent to American Eagle registering or selling its products in areas where Lyle & Scott had established prior rights. Strohm responded with the following email on March 13, 2006:

> During our meeting in London, we reached an agreement ("London Agreement") on the various points at issue. At your specific request, we prepared a list of the key terms prior to the end of the meeting and you were given a copy. . . . If we understand your March 3 email, you are now attempting to dramatically and materially change the terms of the London agreement; indeed, your proposal virtually emasculates it.

Following this email, the parties stopped communicating, and the instant suit was filed. American Eagle promptly moved for a declaratory judgment and specific performance of its purported agreement with Lyle & Scott and its parent company, HW.

## II.

### A.

■ We review a grant of summary judgment de novo, and thus apply the

same standard as that used by the District Court. *CAT Internet Servs. Inc. v. Providence Wash. Ins. Co.*, 333 F.3d 138, 141 (3d Cir.2003).

A court may grant summary judgment if, drawing all inferences in favor of the nonmoving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A motion for summary judgment will not be defeated by "the mere existence" of some disputed facts, but will be denied when there is a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

 In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 248–49, 106 S.Ct. 2505. All inferences must be drawn in the light most favorable to the nonmoving party. *Pa. Prot. & Advocacy, Inc. v. Pa. Dept. of Pub. Welfare*, 402 F.3d 374, 379 (3d Cir.2005) ("We are required to review the record and draw inferences in a light most favorable to the nonmoving party, ... yet the nonmoving party must provide admissible evidence containing 'specific facts showing that there is a genuine issue for trial.'" (quoting Fed.R.Civ.P. 56(e))). "[W]hen there is a disagreement about the facts or the proper inferences to be drawn from them, a trial is required to resolve the conflicting versions of the par-

ties." *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir.1982).

### B.

In granting summary judgment for American Eagle, the Magistrate Judge found that the parties had created an enforceable contract, and further, that the terms of the contract were not ambiguous. Although the Magistrate Judge acknowledged that issues of this sort are typically decided by a jury, she concluded that "no reasonable jury relying on the evidence could resolve these issues in favor of [Lyle & Scott]," *Am. Eagle Outfitters, Inc. v. Lyle & Scott Ltd.*, No. 06–CV–607, 644 F.Supp.2d 624, 629 n. 1, 2008 WL 5101354 at * 1 n. 1 (W.D.Pa. Nov. 26, 2008), and thus decided the case as a matter of law.[4] We will address these issues in turn: first, whether an enforceable contract was formed, and second, whether the terms are sufficiently clear to warrant summary judgment.

### 1.

The first issue before the Court concerns the enforceability of the London Memorandum. "[T]he test for enforceability of an agreement is whether both parties have manifested an intention to be bound by its terms and whether the terms are sufficiently definite to be specifically enforced."[5] *Channel Home Ctrs. v. Grossman*, 795 F.2d 291, 298–99 (3d Cir. 1986) (citing *Lombardo v. Gasparini Excavating Co.*, 385 Pa. 388, 123 A.2d 663, 666 (1956)); *see USA Machinery Corp. v. CSC, Ltd.*, 184 F.3d 257, 263 (3d Cir.1999).

---

4. Both parties concede that Pennsylvania law applies to this dispute.

5. The other requirements of an enforceable contract, such as consideration, are not contested by the parties. *See Channel Home*

*Ctrs.*, 795 F.2d at 298–99 (noting that an enforceable agreement requires a mutual intention to be bound, definite terms, and consideration on both sides).

### a.

■ The first element of the test for enforceability of a contract is whether both parties manifested an intention to be bound. *ATACS Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 666 (3d Cir.1998) (citing *Channel Home Ctrs.*, 795 F.2d at 298–99). In assessing intent, the object of inquiry is not the inner, subjective intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior. *Ingrassia Constr. Co., Inc. v. Walsh*, 337 Pa.Super. 58, 486 A.2d 478, 483 (1984). Accordingly, "a true and actual meeting of the minds is not necessary to form a contract." *Id.*

The parties have differing versions of what was intended by the London Memorandum. American Eagle argues that the London Memorandum reflected the parties' mutual intent to reach an agreement; Lyle & Scott, on the other hand, argues that the London Memorandum was merely a stepping stone on the way to further negotiations—a document that could be used as the basis for a future contract.

Pennsylvania law has "long recognized the principle that documents, having the surface appearance of contracts may be in fact evidence of mere negotiating by parties with a view toward executing a binding contract in the future." *Goldman v. McShain*, 432 Pa. 61, 247 A.2d 455, 458 (1968). Accordingly, "[i]t is hornbook law that evidence of preliminary negotiations or an agreement to enter into a binding contract in the future does not alone constitute a contract." *Channel Home Ctrs.*, 795 F.2d at 298; *ATACS*, 155 F.3d at 666–67 ("[I]t is well established that evidence of preliminary negotiations or a general agreement to enter a binding contract in the future fail as enforceable contracts because the parties themselves have not come to an agreement on the essential terms of the bargain and therefore there is nothing for the court to enforce."); *Lombardo*, 123 A.2d at 666 ("Plaintiff's testimony clearly shows that the parties intended only to enter into a binding agreement sometime in the future. In such a case, the preliminary negotiations do not constitute a contract."). On the other hand, however, "parties may bind themselves contractually although they intend, at some later date, to draft a more formal document." *Goldman*, 247 A.2d at 459. Thus, "[m]utual manifestations of assent that are in themselves sufficient to make a contract will not be prevented from so operating by the mere fact that the parties also manifest an intention to prepare and adopt a written memorial thereof. . . ." Restatement (First) of Contracts § 26 (1932).

The Magistrate Judge decided this case as a matter of law, holding that both American Eagle and Lyle & Scott intended the London Memorandum to be a contract, and that no reasonable jury could decide otherwise.[6] We agree.

---

6. Lyle & Scott argues that in reaching this decision, the Magistrate Judge improperly reversed the burden of proof required to establish intent to contract. Specifically, Lyle & Scott argues that rather than requiring American Eagle to establish by a preponderance of the evidence that Lyle & Scott intended to be bound by the London Memorandum, the Magistrate Judge effectively required Lyle & Scott to prove that it did not intend to be bound by the London Memorandum. We are not persuaded by this argument. The Magistrate Judge laid out the standard correctly, and noted that the burden was on American Eagle to prove the existence of the contract. *Am. Eagle Outfitters*, 644 F.Supp.2d at 635-36, 2008 WL 5101354, at *7. When the Magistrate Judge did phrase her conclusions in double negative form—stating, essentially, that Lyle & Scott *did not* demonstrate that it intended not to be bound by the London Memorandum—she was responding to a specific argument by Lyle & Scott that the par-

Although Lyle & Scott argues that the parties were merely setting the parameters for a future agreement during their London meeting, Peter Hall, Lyle & Scott's lead negotiator, consistently acted as if an agreement had been formed. This is seen most clearly in Hall's own words. During the meeting in London, Hall took copious notes, detailing both his negotiations with American Eagle as well as his conversations with Harris, his employer and HW's principal. The notes of these latter conversations are particularly instructive. During the lunch break of the London meeting, Hall telephoned Harris and updated him on the status of negotiations. He advised Harris that American Eagle would neither change its logo nor cease selling over the Internet, and that American Eagle would rather fight it out in court than concede either point. Before ending the phone call, Hall advised Harris that there were two basic options: "settle or fight." (App.642.)

Later in the lunch break, Hall and Harris spoke again and discussed possible settlement parameters. Harris conveyed Watson's desire to keep American Eagle out of the golf market. The pair also discussed acceptable dollar figures, which Hall transcribed in the following note: "If can settle @ ≥£250 — > settle + take it ... ("Just to be clear ... accept co-exis-

tence if pay £¼ m ... yes"). (App.642.) From this conversation, Hall was evidently empowered to accept any settlement that reached £250,000.

After speaking with Harris, Hall made notes which he captioned "Negotiating Pts." In these notes, he stated that "ideally" Lyle & Scott wanted £1,000,000 from American Eagle. However, he noted that if parties could settle on a figure of £500,-000 or $1,000,000, Hall should "call it" and make the deal. After some negotiating, Hall achieved the million dollar figure. The parties then moved on to the other terms of their "coexistence agreement," (App.643) and the London Memorandum was generated from this discussion.

After the parties arrived at an acceptable set of terms, Hall behaved as if an agreement had been formed. It was Hall who recommended that the parties set out the London Memorandum in writing. Neither party suggested that the "without prejudice" language—which had been inserted into all their previous communications—be included in the London Memorandum.[7] Hall then offered to sign the London Memorandum, and would have done so had not Strohm told him that she would soon send him a formal letter version of the agreement, which he could sign

---

ties had affirmatively expressed the intent not to be bound. The Magistrate Judge observed:
> The Defendants argue first that those attending the London Meeting expressed the intent "not to be bound until a formal written agreement had been executed by the [parties' principals.]" The record belies this argument. The evidence does not show that any of the parties addressed or manifested in any way an understanding that they would not be bound by the terms of the London Memorandum.

*Id.* at 637, at *8 (alteration in original). Here, the Magistrate Judge's statements merely served to negate Lyle & Scott's specific arguments—not invert the burden of proof.

7. We concur with the thorough reasoning of the Magistrate Judge in regard to the parties' mutual decision not to include "without prejudice" language on the London Memorandum. The purpose of discussing potential settlements "without prejudice" is to "encourage contract formation by freeing the parties from fear that their words could be used against them if settlement failed...." *Am. Eagle Outfitters,* 644 F.Supp.2d at 642, 2008 WL 5101354, at * 13. It makes little sense to say that the previous use of such language in settlement communications would prevent the parties from reaching a binding contract if and when they decided to do so.

instead. Thus, having seen fit to "call it" and make a deal for $1,000,000, Hall was quite willing to sign a written agreement stating that "the Parties agree as follows" before he even left the negotiating table.

In the weeks and months that followed, Hall consistently referred to the settlement reached in London as an "agreement." On January 30, 2006, six days after Strohm emailed Hall the draft agreement, and three days after Hall expressed his concern over whether the draft language permitted American Eagle to register outside the United States, Hall met with Harris and Watson to discuss next steps. In his notes of that meeting, Hall recorded the following question, "[w]hat have we agreed/what do they think we agreed," indicating that Hall and/or the principals of HW believed that an agreement of some form had been reached in London. (App.643.) [8] Even as late as February 10, 2009—when the parties were clearly at odds over their interpretations of the London Memorandum language— Hall was still referring to what transpired in London as "an agreement." (App. 644 ("When we came to an agreement ... I suggested we set [out the terms] in writing then and there.").)

 The evidence that Lyle & Scott intended to enter a binding agreement is, frankly, overwhelming. The "objective manifestations" of Hall's intent—both his actions and his words (whether those words were emailed, transcribed, or said aloud)—show that Hall intended to enter a contract, and that he considered the London Memorandum to be a binding agreement. *Ingrassia Constr. Co., Inc. v. Walsh*, 337 Pa.Super. 58, 486 A.2d 478, 483 (1984) ("In ascertaining the intent of the parties to a contract, it is their outward and objective manifestations of as-

sent, as opposed to their undisclosed and subjective intentions, that matter."). As we see it, the only plausible argument that Lyle & Scott makes regarding the issue of intent relates to whether American Eagle, not Lyle & Scott, intended to contract. Specifically, Lyle & Scott argues that because Strohm told Hall not to sign the London Memorandum, American Eagle did not intend to form a binding contract in London. We are, however, unconvinced. Signatures are not dispositive evidence of contractual intent. *See Commerce Bank/Pennsylvania v. First Union Nat'l Bank*, 911 A.2d 133, 145–46 (Pa.Super.Ct.2006) (" 'As a general rule, signatures are not required for a binding contract unless such signing is expressly required by law or by the intent of the parties.' " (quoting *Shovel Transfer & Storage, Inc., v. Pa. Liquor Control Bd.*, 559 Pa. 56, 739 A.2d 133, 136 (1999))). The parties, therefore, did not need to sign the London Memorandum to reflect their intent that it form a binding contract. Moreover, the record before us shows that American Eagle's negotiators comported themselves during the London meeting in a manner that indicated that they, like Hall, believed that a deal had been struck. Fiore recollected that stating "we have a deal" (or something to similar effect) once the meeting ended, indicating American Eagle's intent to contract in clear, objective terms that matched Hall's apparent belief in the same. (App.969.) In this light, we agree with the Magistrate Judge that Strohm's offer to generate a more fleshed out version of their agreement did not bear on the parties' intent to form a contract. *Goldman v. McShain*, 432 Pa. 61, 247 A.2d 455, 459 (1968) ("[P]arties may bind themselves contractually although they in-

---

**8.** It's not absolutely clear whether Hall attributed this question to himself, Harris, or Wat-

son. For the purposes of this discussion, however, it is of no consequence.

tend, at some later date, to draft a more formal document."). For these reasons, we believe that both Lyle & Scott and American Eagle intended to create a binding contract during the London meetings, and, as the Magistrate Judge concluded, that no reasonable jury could see it otherwise.[9]

b.

■ It is not enough, of course, that the parties intended to contract. "[I]n order for there to be an enforceable contract, the nature and extent of its obligation must be certain; the parties themselves must agree upon the material and necessary details of the bargain." *Lombardo v. Gasparini Excavating Co.*, 385 Pa. 388, 123 A.2d 663, 666 (1956). In other words, we look to see whether "the terms are sufficiently definite to be specifically enforced." *Channel Home Ctrs. v. Grossman*, 795 F.2d 291, 298–99 (3d Cir.1986). Whether the terms are sufficiently definite is a question of law. *Cf. id.* at 300 (finding terms to be sufficiently definite to warrant enforcement of the contract).

■ Lyle & Scott argues that even if the parties had sufficient intent to form a contract, the terms of the London Memorandum pertaining to registration—in particular, terms four and six—are too ambiguous to be enforced, and thus the entire contract is unenforceable. *Mazzella v. Koken*, 559 Pa. 216, 739 A.2d 531, 537 (1999) ("If, however, there exist ambiguities and undetermined matters which render a set-

tlement agreement impossible to understand and enforce[,] such an agreement must be set aside." (alteration in original) (internal quotation marks omitted)). This goes too far. Lyle & Scott is correct to assert that under certain circumstances, a contract could be so vague that a court might find the contract "impossible to understand and enforce." *Id.* In *Lombardo*, for example, a case relied upon by Lyle & Scott, the Pennsylvania Supreme Court found that a specific contract failed for indefiniteness, noting that the enforceability of a contract depends upon certainty of the parties' obligations and mutual agreement over the necessary details of the bargain. *Lombardo*, 123 A.2d at 666. In that case, however, "there was no agreement or even discussion as to any of the essential terms of the alleged bargain such as time or manner of performance, price to be paid, or the like." *Id.* There the contract was clearly indefinite—the parties had never reached any kind of accord over the necessary components of their deal. We, however, are not faced with such a contract. The agreement reached between American Eagle and Lyle & Scott covered all the necessary bases—there are no undetermined matters—and the agreement is not impossible to understand. To the extent that we think there is some ambiguity in the meaning of clauses four and six, it is the more garden-variety type of ambiguity relating to contractual interpretation. Disputes over the meaning of a given phrase are common in contract disputes; the presence of such interpretative ambi-

---

**9.** At some point after the London meeting, Lyle & Scott developed second thoughts about the contract terms that it had agreed to with American Eagle. *Compare, e.g.,* London Memorandum (App.170) ("AE to sell products in AE stores, stores within stores or AE website") and Hall Notes (App.643) ("[R]estrict to AEO outlets/internet") and Hall Email of January 26, 2006 (App.198) ("[N]aturally we will not object with your internet selling activities

....") with Hall Email of January 31, 2009 (App.196) ("[W]e now have significant issues in allowing you to trade into territories outside America."). Those regrets, however, have no bearing on whether the two parties intended to form an agreement during their meeting in London. We believe any reasonable jury would see past Lyle & Scott's second-thoughts and find that both parties intended to form a contract.

guity, however, does not go to whether the contract is enforceable, but rather who (the judge or the jury) must decide what the given clause means. *See, e.g., Ram Constr. Co. v. Am. States Ins. Co.*, 749 F.2d 1049, 1052 (3d Cir.1984) ("When the agreement is in writing, ambiguous terms are interpreted by the jury, unambiguous ones by the court."). To hold otherwise would improperly transform run-of-the-mill challenges to the interpretation of contractual language into far more significant disputes over contractual enforceability.

Lyle & Scott also argues that we should rely on *Mazzella v. Koken*, another Pennsylvania Supreme Court case. 559 Pa. 216, 739 A.2d 531 (1999). *Mazzella*, however, is also distinguishable. In *Mazzella*, the parties orally agreed to settlement terms. Mazzella drafted its understanding of the terms into a formal document and sent them to the defendant. The defendant, however, substantially modified the document before returning it to Mazzella, who in turn refused to sign. On these facts, the court found that the parties had not formed a contract: because the parties never reached a meeting of the minds on the essential terms of the agreement, the draft agreements the two parties exchanged were more properly seen as offers and counter-offers, not mere memorializations of a previously agreed-to contract. *Id.* at 538. The situation before us, however, is far different. Here, the parties reduced their agreement to writing in each others' presence, addressed all the salient points of concern to the parties, and even collaborated on the language. In fact, the allegedly ambiguous registration language in clause six was actually proposed by Lyle & Scott, the party that now argues that the language is too indefinite to be enforced. (App.373.) Whereas in *Mazzella* it may have been "impossible to understand" what the parties agreed to because their initial efforts at memorializing the agree-

ment differed so wildly, here we know exactly what terms the parties agreed to. Therefore, any ambiguity that flows from the language they used to craft the terms of their agreement is more properly seen as a dispute over the interpretation of the contract, not the definiteness (and thus enforceability) of the contract.

We agree with the Magistrate Judge that the terms of the London Memorandum are sufficiently definite to warrant enforcement. The parties addressed all the essential issues that necessitated their meeting in London: the use of the eagle logo, American Eagle's right to sell its products online and overseas, the payment of taxes and attorneys' fees, American Eagle's withdrawal from the golf market, and the scope and nature of each parties' registration. Because no key matters were left undetermined, all the material terms were addressed, and we do not find the contract impossible to understand, the contract cannot be set aside for indefiniteness. *See id.*

In sum, we find that the parties intended to form an agreement, and that the terms of that agreement do not fail for indefiniteness. Accordingly, we agree with the Magistrate Judge that the London Memorandum formed a binding contract between American Eagle and Lyle & Scott.

2.

For the reasons noted above, we agree with the Magistrate Judge that American Eagle and Lyle & Scott agreed to an enforceable contract. We do not find, however, that the terms agreed to by the parties are sufficiently unambiguous to permit judicial interpretation of the contract. For the reasons that follow, we believe that the text of clauses four and six, insofar as they address the issue of

registration, are ambiguous, necessitating fact-finding by a jury.

### a.

 "[A]s a preliminary matter, courts must determine as a matter of law which category written contract terms fall into—clear or ambiguous." *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 613 (3d Cir.1995) (internal quotation marks omitted). The common law has long recognized that, as a general matter, interpretation of a written agreement is a task to be performed by the court rather than a jury. *Gonzalez v. U.S. Steel Corp.*, 484 Pa. 277, 398 A.2d 1378, 1385 (1979); *Allegheny Int'l v. Allegheny Ludlum Steel Corp.*, 40 F.3d 1416, 1424 (3d Cir.1994) ("Under Pennsylvania law, ambiguous writings are interpreted by the fact finder and unambiguous writings are interpreted by the court as a question of law."). Adherence to this approach "contributes to the stability and predictability of contractual relations and provides a method of assuring that like cases will be decided alike." *Gonzalez*, 398 A.2d at 1385 (internal quotation marks omitted). However, this approach—judicial interpretation of contract—only holds so long as the words of the contract are clear and unambiguous, or the extrinsic evidence is conclusive. *Martin v. Monumental Life Ins. Co.*, 240 F.3d 223, 233 (3d Cir.2001) ("If the contract terms are ambiguous or incomplete, and extrinsic evidence is examined, interpretation of the contract becomes a question of fact, unless the extrinsic evidence is conclusive."). In circumstances where the language chosen by the parties is ambiguous, deciding the intent of the parties becomes a question of fact for a jury. *Community Coll. of Beaver County v. Community Coll. of Beaver*, 473 Pa. 576, 375 A.2d 1267, 1275 (1977).

### b.

"The paramount goal of contract interpretation is to determine the intent of the parties." *Garden State Tanning, Inc. v. Mitchell Mfg. Group, Inc.*, 273 F.3d 332, 335 (3d Cir.2001) (citing *Meeting House Lane, Ltd. v. Melso*, 427 Pa.Super. 118, 628 A.2d 854, 857 (1993)). Pennsylvania contract law begins with the "firmly settled" principle that "the intent of the parties to a written contract is contained in the writing itself." *Krizovensky v. Krizovensky*, 425 Pa.Super. 204, 624 A.2d 638, 642 (1993) (citing *Steuart v. McChesney*, 498 Pa. 45, 444 A.2d 659, 661 (1982)). "When the words are clear and unambiguous," the intent of the parties must be determined from "the express language of the agreement." *Steuart*, 444 A.2d at 661 ("[T]he focus of interpretation is upon the terms of the agreement as manifestly expressed, rather than as, perhaps, silently intended."). Accordingly, " '[w]here the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence.' " *Id.* (quoting *E. Crossroads Ctr., Inc. v. Mellon-Stuart Co.*, 416 Pa. 229, 205 A.2d 865, 866 (1965)). "Clear contractual terms that are capable of one reasonable interpretation must be given effect without reference to matters outside the contract." *Krizovensky*, 624 A.2d at 642.

On the other hand, a contract is ambiguous, and thus presents a question of interpretation for a jury, if the contract " 'is reasonably susceptible of different constructions and capable of being understood in more than one sense.' " *Allegheny Int'l*, 40 F.3d at 1425 (quoting *Hutchison v. Sunbeam Coal Corp.*, 513 Pa. 192, 519 A.2d 385, 390 (1986)); *Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 93 (3d Cir.2001) ("[A] contract will be found ambiguous if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being un-

derstood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning." (quoting *Duquesne Light Co.*, 66 F.3d at 614 (internal quotation marks omitted))). Under such circumstances, a court may look "outside the 'four corners' of [the] contract . . . [and] receive extrinsic evidence, i.e., parol evidence, to resolve the ambiguity." *Id.*

c.

■■■ The Magistrate Judge held that the two terms that discuss the issue of registration—clauses four and six—were not ambiguous, and that the London Memorandum did not in any way restrict American Eagle's ability to register its mark. Those terms read as follows:

> Perpetual and worldwide pertaining to goods of LS registrations
>
> . . .
>
> Each party shall consent to the registration of the other's eagles and AE shall withdraw its opposition against LS application in the US

(App. 170.) The Magistrate Judge held that the "clear import" of clause four was that "the co-existence agreement made between AE and [LS] was unlimited, encompassing every type of good for which [LS] had registered its mark." *Am. Eagle Outfitters*, 644 F.Supp.2d at 649, 2008 WL 5101354, at *20. The Magistrate Judge held that clause six was also unambiguous, noting in a footnote that had "LS intended to limit the areas in which AE was permitted to register its mark, it could have done so clearly and explicitly." *Id.* at 650 n. 13, at *20 n. 13.

Although we agree that the Magistrate Judge's construction of the registration

provisions is reasonable, we cannot find that it is the only reasonable interpretation. The London Memorandum, in part through the informal nature of its production, is not a prime example of clear drafting, and is marked by incomplete sentences and haphazard punctuation. *See Allegheny Int'l*, 40 F.3d at 1425 (noting that "a patent ambiguity is that which appears on the face of the instrument, and arises from the defective, obscure, or insensible language used." (internal quotation marks omitted)). While the language in question could be interpreted to mean that American Eagle would be permitted to register its mark in any of the numerous countries where Lyle & Scott holds trademark rights, we do not find it unreasonable to read the language as limiting actual registration to the United States forum. Nor do we find the parole evidence available on the issue particularly enlightening.[10] In short, in light of the lack of clarity in the registration-related provision of the London Memorandum, we cannot state that the contract's terms are unambiguous, or that there is only one reasonable way to read the contract. Accordingly, we will remand the case to the Magistrate Judge so that a jury can interpret the contract's provisions discussing the respective registration rights of the parties.

III.

For the reasons stated above, we agree with the Magistrate Judge that the London Memorandum formed a binding contract between American Eagle and Lyle & Scott, but we find that the terms of that contract were sufficiently ambiguous to warrant interpretation by a jury.

---

10. For example, Hall's notes from the London meeting say, simply: "will register their logo but allow/not oppose ours." This evidence is insufficiently conclusive to warrant judicial construction of the contract.

JORDAN, Judge, concurring in part and dissenting in part.

I agree with Judge Fuentes that the London Memorandum is ambiguous as to the registration rights that the parties were prepared to grant each other.[11] But I also believe that American Eagle has failed to establish that it is entitled to summary judgment on whether the parties manifested an intent to be bound by the jottings in that very brief document. I believe there remains a material question of fact as to the parties' intent, and, accordingly, would let a jury determine whether there was a contract at all.

Under Pennsylvania law, which the parties have treated as controlling, "the test for enforceability of an agreement is whether both parties have manifested an intention to be bound by its terms and whether the terms are sufficiently definite to be specifically enforced." *Channel Home Ctrs., Div. of Grace Retail Corp. v. Grossman*, 795 F.2d 291, 298–99 (3d Cir. 1986) (citing *Lombardo v. Gasparini Excavating Co.*, 385 Pa. 388, 123 A.2d 663, 666 (1956)). We have sanctioned a factfinder's use of a number of criteria in order to evaluate whether the parties manifested an intent to be bound, including,

whether the contract is of that class which are usually found to be in writing, whether it is of such nature as to need a formal writing for its full expression, whether it has few or many details, whether the amount involved is large or small, whether it is a common or unusual contract, [and] whether the negotiations themselves indicate that a written draft is contemplated as the final conclusion of the negotiations.

*In re ABC–Federal Oil & Burner Co.*, 290 F.2d 886, 889 (3d Cir.1961) (quoting *Mississippi & Dominion Steamship Co. v. Swift*, 86 Me. 248, 29 A. 1063, 1067 (1894)); *see Price v. Confair*, 366 Pa. 538, 79 A.2d 224, 226 (1951) (determining intent with reference to things such as "the surrounding circumstances, the situation of the parties, the objects they apparently have in view, and the nature of the subject-matter of the agreement."); *see also Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 575–76 (2d Cir.1993) (suggesting the following factors: (1) number of terms agreed upon compared to total number to be included in a formal document; (2) relationship of the parties; (3) degree of formality attending similar contracts; (4) acts of partial performance by one party accepted by the other; (5) usage and custom of the industry; (6) subsequent conduct and interpretation by the parties themselves; (7) whether writing is contemplated merely as "memorial;" (8) whether contract needs a formal writing for its full expression; (9) whether any terms remain to be negotiated; (10) whether the sup-

---

**11.** While I agree there is ambiguity, I do not join all of Judge Fuentes's opinion on this point. To the extent his conclusions about the ambiguities are couched in language assuming a contract existed, I part company with him, for the reasons stated herein, though I do agree that, were there a contract, the language is not so ambiguous as to be beyond enforcement. I also disagree with Judge Nygaard, who concludes in a partial dissent that the language of the fourth and sixth clauses of the London Memorandum is "crystal clear." Nowhere in that document is it stated that the parties agreed to give each other perpetual and worldwide registration rights. To the contrary, while the parties might have intended something to be "perpetual and worldwide pertaining to goods of LS registrations" (App.645), the London Memorandum itself gives little clue as to what that something is. Although that language might relate to registration rights, it is also quite plausible that it only provides American Eagle with a perpetual and worldwide license to sell goods of LS registrations. That interpretation is bolstered by the parties' decision to deal specifically with registration in a separate clause.

posed contract has few or many details; (11) whether amount involved is large or small; (12) whether a standard form is widely used in similar transactions or whether this is an unusual type of contract; (13) the speed with which the transaction must be concluded; (14) the simplicity or complexity of the transaction; (15) the availability of information necessary to decide whether to enter into a contract; and (16) the time the supposed contract was entered). With the variety of issues and evidence available for review in evaluating whether there has been a manifestation of intent to form a contract, it is no surprise that, as the Magistrate Judge's opinion notes, such an issue is "rarely appropriate for disposition by the Court." *American Eagle Outfitters, Inc. v. Lyle & Scott Ltd.*, No. 2:06–cv–00607, 644 F.Supp.2d 624, 629, 2008 WL 5101354, at *1 (W.D.Pa. Nov.26, 2008); *see id.* at 635–36, at *7 (reciting the 16 factors listed in *Consarc*).

A reasonable jury in this case could conclude that the requisite manifestation was absent, based on a number of elements in the record.

First, both Hall and Fiore testified that they believed the term "without prejudice"—the term that indisputably applied to the parties' London meeting—meant "non-binding." (App. 951:20–952:12 (Fiore Depo); App. 340 at 126:18–127:2 (Hall Depo).) The legal significance of "without prejudice" may be relevant *(see* Maj. Op. at n. 7), but it is hardly dispositive in light of the testimony from both parties' non-lawyer representatives indicating their particular understanding of the term. A

jury could reasonably conclude that the "without prejudice" label they hung on the meeting, if not on the document, manifested an intent not to be bound by anything that occurred during the meeting.

Second, the London Memorandum is unsigned. Of course, Pennsylvania law does not require a signature in order for an agreement of the kind at issue here to be binding. *Commerce Bank/Pennsylvania v. First Union Nat'l Bank*, 911 A.2d 133, 145–46 (Pa.Super.Ct.2006).[12] Importantly, however, American Eagle's in-house counsel, Strohm, specifically told Hall, who is not an attorney, to refrain from signing the list of bullet points at the conclusion of their meeting. From the deposition transcripts alone, it is hard to tell how emphatically Strohm delivered that instruction to Hall, but a jury could reasonably conclude that she effectively conveyed to Hall an intent not to be bound by the hand-written notes that emerged from the meeting. That conclusion is especially reasonable in light of the Delaware choice-of-law provision that Strohm included in the draft formal document that she later circulated, which indicates that she believed the London Memorandum would not be binding without a signature. *See* Del.Code Ann. tit. 6, § 2714(a) (prohibiting enforcement of an obligation lasting more than a year, unless the contract giving rise to the obligation is reduced to a signed writing); *Shovel Transfer & Storage, Inc. v. Pennsylvania Liquor Control Bd.*, 559 Pa. 56, 739 A.2d 133, 136 (1999) ("As a general rule, signatures are not required unless such signing is expressly required by law or by the intent of the parties.").[13]

---

**12.** In *Commerce Bank,* the trial court had decided that an unsigned settlement agreement was enforceable, but only after it had held an evidentiary hearing. 911 A.2d at 146–47. The Superior Court affirmed the trial court's ruling. *Id.*

**13.** Fiore's self-serving testimony that, at the end of the meeting, he "probably said something to the effect that we have a deal" (App. 969:22–23) is hardly conclusive evidence that American Eagle manifested an intent to be bound. Hall, whose deposition was taken

Third, American Eagle appeared to act inconsistently with the London Memorandum. The sixth bullet point by which the parties allegedly agreed to be bound states, "Each party shall consent to the registration of the other's eagle and AE shall withdraw its opposition against LS application in the US." (App. at 645.) Whatever that means, it certainly does not mean that American Eagle was free to file an opposition to Lyle & Scott's trademark application in the United States. Yet it did just that, approximately one month after the parties supposedly reached their binding agreement. *See Retail Royalty Co. v. Lyle & Scott Ltd.*, Opposition No. 91169126 (T.T.A.B. filed Feb. 8, 2006). A jury could reasonably infer from American Eagle's filing that the parties had not sufficiently conveyed to each other an intent that the London Memorandum bind them.

Fourth, the striking brevity and lack of formality in the alleged agreement is at odds with the extent of the commitments that the parties were negotiating to undertake. The Magistrate Judge observed that "the London Memorandum certainly lacks the formality one normally associates with a contract for so significant a venture," and yet the Judge concluded that the lack of formality was insignificant. *American Eagle Outfitters, Inc.*, 644 F.Supp.2d at 639, 2008 WL 5101354, at *10. That conclusion is open to reasonable debate and therefore cannot support summary judgment. Although the Magistrate Judge did not cite authority for her conclusion, the language she used tracks that previously used by the Pennsylvania Supreme Court in *Goldman v. McShain*, 432 Pa. 61, 247 A.2d 455, 458 (1968) ("While this document certainly lacks the formality

one normally associates with a contract for so significant a venture, it seems fairly certain that the instrument shows that the parties agreed to construct the theater...."). *Goldman*, however, suggests that a jury should consider the distinct disparity between the rough-notes nature of the London Memorandum and the highly significant legal venture the parties contemplated. It is noteworthy that the court in *Goldman* did not say that the existence of a contract had been established in that case as a matter of law; it held just the opposite, saying, "it is not at all clear from the pleadings in the present case that Goldman and McShain did not consummate a binding agreement. *Only a trial can uncover this crucial fact.*" *Id.* at 459 (emphasis added). Similarly, the Magistrate Judge should have recognized, as should we, that the question of whether the parties before us stumbled into a perpetual and worldwide trademark coexistence agreement is one for the jury.

Fifth, and finally, the parties were unable to reach a more formal agreement. To be sure, "parties may bind themselves contractually although they intend, at some later date, to draft a more formal document." *Goldman*, 247 A.2d at 459; *see Melo–Sonics Corp. v. Cropp*, 342 F.2d 856, 859–60 (3d Cir.1965) ("[I]t is well-settled in Pennsylvania that where the parties have settled upon the essential terms and the only remaining act to be done is the formalization of the agreement, the latter is not inconsistent with the present contract...."). But these rules do not prevent Lyle & Scott from relying on the parties' failure to draft a formal document as evidence that a question of intent re-

---

earlier, never had a chance to address Fiore's description of events. Similarly, Strohm's later email to Hall stating that "[d]uring our meeting in London, we reached an agreement ('London Agreement') on the various points at

issue" (App.1194) was the last communication between the parties before this suit was filed and can reasonably be seen as mere prelitigation posturing.

mains for·trial. In fact, both the *Goldman* court, as noted above, and the *Melo–Sonics* court remanded for trial the question of whether an agreement existed. *Goldman*, 247 A.2d at 459; *Melo–Sonics*, 342 F.2d at 860 ("Whether this plaintiff can establish the facts which he has alleged in his complaint and bring himself within the rule above discussed is a matter which only a trial can settle ...."); *see also Building Mart, Inc. v. Allison Steel Mfg. Co.*, 380 F.2d 196, 199 (10th Cir.1967) ("The question whether the parties intended any prior agreement to be binding notwithstanding a contemplated later written memorialization ... was a question of fact inappropriate for summary resolution"). Thus, certain differences and later disagreements about what terms should be in the formal document may support an inference, left for the factfinder to accept or reject, that the parties did not intend the London Memorandum to control.

One type of evidence that ought not play a role in evaluating the parties' manifestation of intent is evidence of things never expressed by one side to the other. Contracting parties must outwardly and objectively demonstrate their intent to be bound; subjective beliefs and reservations are irrelevant. *See Long v. Brown*, 399 Pa.Super. 312, 582 A.2d 359, 363 (1990) ("[O]bjective manifestation is the governing factor, regardless of subjective beliefs and reservations."). The majority's acknowledgment that subjective intent is irrelevant is at odds with its statement that Hall's notes of his conversations with his employer are "particularly instructive" and that they support a conclusion that he "consistently" referred to the settlement as an agreement. *(See* Maj. Op. at II.B. 1.a.) Lyle & Scott's internal discussions are only relevant if we infer that Hall somehow conveyed the substance of those discussions to American Eagle. But that inference is inappropriate for us to make

at the summary judgment stage. *See Siegel Transfer, Inc. v. Carrier Exp., Inc.*, 54 F.3d 1125, 1127 (3d Cir.1995) ("In considering a motion for summary judgment, a court ... must view facts and inferences in the light most favorable to the party opposing the motion."). Indeed, we are bound to make inferences in favor of the non-movant, and in this instance one could surely infer that Lyle & Scott's internal thoughts were not conveyed to American Eagle since one is generally less open with adversaries than with one's own side.

My colleagues express a concern that Lyle & Scott is now backpedaling from a proposal that its agent appeared all too eager to accept when he was at the bargaining table. (Maj. Op. at n. 9.) I share that concern. The law of Pennsylvania, however, states that both parties must manifest an intent to be bound, and, until that happens, each side is free to have second thoughts. Where, as here, competing inferences are possible, the law does not allow us to take away from a jury the question of whether such an intent was conveyed.

I am not suggesting that the evidence presented clearly shows that Lyle & Scott is entitled to disregard the London Memorandum. A jury might conclude from certain parts of the record in this case that the parties actually did manifest an intent to be bound. The very existence of the document at issue, especially the preliminary statement in the document that the "[p]arties agree as follows" (App. at 645), is strong evidence of a manifestation of intent. *See In re ABC–Federal Oil & Burner Co.*, 290 F.2d at 889 ("If a written draft is proposed, suggested, or referred to during the negotiations, it is some evidence that the parties intended it to be the final closing of the contract.") (quotation omitted). And some of the emails between the parties subsequent to their meeting

provide support for American Eagle, particularly the one from Hall stating that the parties "came to an agreement." (App. at 644.)

Nevertheless, it is fundamental under Federal Rule of Civil Procedure 56 that we must acknowledge evidence that supports a different conclusion than the one proposed by the party moving for summary judgment, even if that evidence does not directly speak to parts of the record that, standing alone, support the movant's case. *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992). In other words, Lyle & Scott does not need to match, item for item, each piece of evidence proffered by American Eagle in order to raise a genuine issue of material fact. Because of the bad taste left by Lyle & Scott's negotiating tactics, we have, I fear, ventured into weighing evidence and usurped the role of the factfinder.

For the foregoing reasons, I concur that remand is appropriate so that a jury may attempt to determine what the parties intended to say in the London Memorandum. I respectfully dissent, however, to the extent that our decision prevents the jury from considering whether an enforceable contract exists at all.

NYGAARD, Circuit Judge, dissenting in part.

My colleague Judge Fuentes has written a thorough and well-crafted opinion for the Court and I join it in almost every aspect. I believe that Lyle & Scott and American Eagle intended to create a binding contract during their meetings in London and I agree that no reasonable jury could conclude otherwise. Further, I agree with Judge Fuentes' determination that this agreement's terms are sufficiently definite

to be specifically enforced. *See USA Machinery Corp. v. CSC, Ltd.*, 184 F.3d 257, 263 (3d Cir.1999). I part company with him because I do not find clauses four and six to be ambiguous.

Pennsylvania law presumes that a contract conveys the parties' intentions to be bound. We have held, therefore, that a contract will be found ambiguous only if it is reasonably or fairly susceptible to different constructions, capable of being understood in more than one sense, obscure in meaning through indefiniteness of expression or its words have a double meaning. *See BohlerUddeholm America Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 93 (3d Cir.2001). My colleagues believe that clauses four and six of the agreement are reasonably susceptible to different constructions. Specifically, Judge Fuentes and Judge Jordan believe that it is reasonable to read the language of these clauses as limiting registration to the United States. I cannot agree.

I find the language of the clauses crystal clear as it pertains to registration rights. First, such rights were to be "perpetual and worldwide." To me, the term "worldwide" indicates a global dimensionality and cannot reasonably be interpreted as limiting registration only to the United States. I can interpret this clause no other way. Therefore, I agree with Magistrate Judge Hay that the only way to construe this clause is that American Eagle would be permitted to register its mark globally. I find clause six equally pellucid. It provides that each party will consent to the registration of the other's marks and that American Eagle would withdraw its objections to Lyle & Scott's registration of its mark in the United States.[14] I find no latent ambiguity here.

---

14. Lyle & Scott did not argue that this clause was ambiguous before the Magistrate Judge.

Pennsylvania's parol evidence rule mandates that when a written contract is clear and unequivocal, its meaning must be determined by its contents alone. *East Crossroads Ctr., Inc. v. Mellon–Stuart Co.,* 416 Pa. 229, 205 A.2d 865, 866 (1965). Putting the majority's dismissal aside, were I to find these clauses ambiguous, the available parol evidence supports my interpretation. The documentary evidence on the record in this case clearly indicates that the parties were working toward an international, global solution to their dispute and in no way were limiting their negotiations to the United States market. The record contains requests for European sales figures, inquiries by Lyle & Scott into American Eagle's international activities, and references in e-mails to the "worldwide" nature of the parties' dispute, among other things. Further, the records clearly demonstrates that the London meeting's discussion focused extensively on the international aspects of the parties' businesses. In summing up various aspects of the London Meeting, Lyle & Scott negotiator Hall wrote that American Eagle "will register their logo but allow/not oppose ours." Hall's notes do not evidence any notion that the discussions on registration of the companies' marks were limited to the United States.

In sum, while I agree with the majority that a contract was formed and that its terms were sufficiently definable, I cannot agree with my colleagues' view that clauses four and six of the agreement were ambiguous. I would affirm the Magistrate Judge's opinion in its entirety.