**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 24-1022
_____

AZER SCIENTIFIC LLC

v.

QUIDEL CORPORATION,
                    Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 5:21-cv-02972)
U.S. District Judge: Honorable John M. Gallagher
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
December 5, 2024
_____

Before: SHWARTZ, MATEY, and McKEE, Circuit Judges.

(Filed: August 12, 2025)
_____

OPINION[*]
_____

SHWARTZ, Circuit Judge.

_____

[*] This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

Quidel Corporation appeals the judgment entered in favor of Azer Scientific LLC on Azer's breach of contract claim. Because the District Court did not err in concluding that a contract was formed between Quidel and Azer, we will affirm.

I[1]

Quidel manufactures at-home COVID-19 test kits and needed a supplier to help fill its kits with reagent. In March 2021, Azer approached Quidel about providing tube-filling services for Quidel test kits. Azer sent Quidel an email stating that "[if] we decide to work together on this project, we would ask Quidel to commit to a minimum order of 12 months usage for 48 million prefilled tubes." App. 343. Quidel requested "tier pricing," and Azer emailed a proposal setting forth prices associated with different volume commitments. App. 351. Quidel stated that it would be "moving forward immediately with ordering at the 3M/week for 12 months tier." App. 355. Azer requested a purchase order and Quidel informed Azer that it needed certain internal approvals before it could supply it.[2] Azer stated that it was willing to "trust the verbal commitment that was given today" and proceed with purchasing the equipment needed to fulfill Quidel's order. App. 367. Quidel cautioned that "[w]hile it is likely that we will move forward, the ultimate decision and signoff will be by higherups in the company," and that it expected to "firm up the answer and direction" soon. App. 367. Thereafter, at

---

[1] We recite the undisputed facts, drawing "all inferences in the light most favorable to the nonmoving party." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009).

[2] The purchase order was a Quidel form used to request shipments from suppliers.

Quidel's request, Azer sent a quote for filling 156 million tubes over a 12-month commitment and also provided a quote for manufacturing the reagent.

On March 25, 2021, Quidel emailed Azer, (1) requesting that Azer send an "updated quote to reflect volume of 10M fills/month for 1 year (120M fills total)"; and (2) stating that it would send "written approval to place orders for equipment today (3/25)." App. 393. Azer replied: "Please see updated quote for 2.5M filled tubes per week . . . . Please confirm to me in writing that we are approved to order the equipment and that we have your commitment. I look forward to receiving the purchase order next Monday." App. 395. Quidel replied: "Please use this note as confirmation that we will be moving forward with the 2.5M/week (10M/month) commitment and to support Azer's order of equipment. We are working on the [purchase order] now." App. 400. Azer responded: "We have began [sic] to order all necessary components as well as the automation. I look forward to working with . . . the whole Quidel team!" App. 399-400.

After Quidel clarified the volume of tubes it sought and Azer provided another updated quote, (1) Azer wired $290,000 to the manufacturer who would produce the custom filling machines that Azer would use to fulfill Quidel's orders, and (2) Quidel sent Azer a signed purchase order reflecting the price and quantity agreed upon in the March 25 emails as well as a draft supply agreement.[3] The parties continued to discuss the terms of a written supply agreement while Azer procured the equipment and prepared

---

[3] The supply agreement included various additional terms addressing compliance with FDA regulations, quality control, and termination, among other things.

to begin production. By mid-June 2021, Quidel decided to "ramp down" its production of "COVID products with respect to Azer [and other suppliers]" because of a reduced sales forecast for at-home COVID tests. App. 580.[4] The parties never fully executed a purchase order or supply agreement and ultimately reached an impasse concerning how to proceed.

Azer sued Quidel for, among other things, breach of contract. After discovery, the parties filed cross motions for summary judgment. The District Court granted Azer partial summary judgment, holding that the March 25 email communications formed a contract. Azer Sci. Inc. v. Quidel Corp., No. 5:21-CV-02972-JMG, 2022 WL 17419347 (E.D. Pa. Dec. 5, 2022). Thereafter, a jury found Quidel breached the contract and awarded Azer $8,521,609.

Quidel appeals.

## II[5]

The issue in this appeal is whether the parties formed a contract under Pennsylvania law.[6] A contract is formed where (1) "both parties manifested an intention to be bound by the agreement"; (2) "the terms of the agreement are sufficiently definite to

---

[4] Quidel and Azer thereafter discussed alternative purchase arrangements. Other than samples, Azer never produced any filled tubes for Quidel.

[5] The District Court had jurisdiction under 28 U.S.C. § 1332. We have jurisdiction under 28 U.S.C. § 1291. We review a District Court's grant of summary judgment de novo. Cranbury Brick Yard, LLC v. United States, 943 F.3d 701, 708 (3d Cir. 2019). Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

[6] The parties agree that Pennsylvania law governs their contractual dispute.

be enforced"; and (3) "there was consideration." ATACS Corp. v. Trans World Commc'ns, Inc., 155 F.3d 659, 666 (3d Cir. 1998) (applying Pennsylvania law); see also Channel Home Ctrs., Div. of Grace Retail Corp. v. Grossman, 795 F.2d 291, 299 (3d Cir. 1986) (same).[7]

The terms of the parties' agreement were sufficiently definite to form an enforceable contract. "Whether the terms [of a contract] are sufficiently definite is a question of law." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 585 (3d Cir. 2009) (applying Pennsylvania law). The parties must agree to the essential terms and "the fact that additional provisions would enhance the position of both parties is not controlling." Field v. Golden Triangle Broad., Inc., 305 A.2d 689, 694 (Pa. 1973). Essential terms include the "time or manner of performance, price to be paid, or the like." Lombardo v. Gasparini Excavating Co., 123 A.2d 663, 666 (Pa. 1956). Because the emails between Quidel and Azer show that the parties agreed that Azer would sell Quidel the District Court correctly concluded that the terms of the contract were sufficiently definite.[8]

---

[7] The parties do not dispute the element of consideration.

[8] That the parties were still working out the supply agreement and that the March 25 emails lacked provisions governing quality control, the timing of deliveries, the termination fee for a breach, and insurance, among other things, does not mean that the terms of the March 25 agreement were not sufficiently definite. See, e.g., Greene v. Oliver Realty, Inc., 526 A.2d 1192, 1201 (Pa. Super. Ct. 1987) ("Vague and indefinite agreements are routinely enforced as long as courts are able to supply 'reasonable' terms."); Field, 305 A.2d at 694 (explaining that parties' failure to specify additional terms which "would enhance the[ir] position" will not prevent courts from finding that a contract was formed).

5

We also agree with the District Court that the parties manifested an intent to be bound by these terms. "In ascertaining the intent of the parties to a contract, it is their outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions, that matter." Tr. Under Deed of Wallace F. Ott, 271 A.3d 409, 416 (Pa. Super. Ct. 2021) (internal quotation marks and citation omitted). "[T]he intent of the parties to a written contract is contained in the writing itself." Krizovensky v. Krizovensky, 624 A.2d 638, 642 (Pa. Super. Ct. 1993). "[P]arties may bind themselves contractually" even when "they intend, at some later date, to draft a more formal document." Am. Eagle Outfitters, 584 F.3d at 582 (internal quotation marks and citation omitted).

No reasonable juror could fail to find that the parties manifested an intent to be bound as of March 25. See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (explaining that summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party"). On March 25, Azer requested explicit confirmation that the parties had a deal on the product, quantity, and price, and Quidel provided such confirmation. Thereafter, Quidel provided Azer with a signed purchase order and Azer ordered manufacturing equipment and began producing samples with Quidel's knowledge and approval.[9]

---

[9] See Yellow Run Coal Co. v. Alma-Elly-Yv Mines, Ltd., 426 A.2d 1152, 1154 (Pa. Super. Ct. 1981) ("The fact that one [party], with the knowledge and approval of the other, has begun performance is nearly always evidence that they regard the contract as consummated and intend to be bound thereby." (internal quotation marks and citation omitted)).

6

Moreover, the fact that the March 25 exchange came after a previous exchange in which Quidel had recognized that the parties were close to creating a binding agreement and explicitly stated that it was not yet ready to commit to the transaction indicates that Quidel knew how to express that it was not yet ready to enter into a binding contract with Azer.[10]

Accordingly, the District Court properly concluded that the parties formed a contract.

---

[10] Quidel's claim that it only agreed to "support Azer's order of equipment," App. 400, fails because the language of the emails show that it agreed to far more, specifically to purchase a set amount of filled tubes over a set period of time.  App. 400; see Am. Eagle Outfitters, 584 F.3d at 582 ("In assessing intent, the object of inquiry is not the inner, subjective intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior.").

## III

For the foregoing reasons, we will affirm.[11, 12]

---

[11] Judge McKee would vacate the District Court's order and remand for further proceedings because, from his point of view, there exists a triable issue of fact as to the parties' intent to form a contract. Judge McKee views the record as showing that there is conflicting evidence as to whether the parties intended that a particular writing would constitute a complete expression of their agreement, and that the jury should resolve those conflicts. Channel Home Ctrs., 795 F.2d at 300-01. Judge McKee notes that, while the March 25 emails did contain specific contractual terms, those emails reference an outstanding purchase order and supply agreement that would govern the relationship between the parties. Since those documents were not fully executed, issues like a termination fee remained unresolved. Although such a fee is not always material, Judge McKee believes that it cannot be said that the fee is immaterial here, given the circumstances in which the negotiations took place. More specifically, the demand for Quidel's test kits was subject to change dramatically based upon the course of the pandemic. Accordingly, Judge McKee concludes that it cannot be said that Quidel's concerns about a termination fee were immaterial or that the March 25 emails outwardly manifested an intent to be bound to an agreement to purchase the product and that it cannot be presumed as a matter of law that what remained to be worked out between the parties was merely a perfunctory squabble over irrelevant conditions of a final agreement.

[12] While one panel member, see supra at n. 11, views the absence of certain terms as an indication that the parties did not intend to enter a binding contract, the parties' failure to discuss ancillary terms in the March 25 emails does not show such a lack of intent and rather, reveals a desire to quickly agree on the terms that would allow for the fast production of a product used to address the global pandemic.