NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-1730
_____

SHELL'S DISPOSAL AND RECYCLING, INC.,
                                        Appellant

v.

CITY OF LANCASTER; CITY COUNCIL; J. RICHARD GRAY, MAYOR;
DEPARTMENT OF PUBLIC WORKS; CHARLOTTE KATZENMOYER,
DIRECTOR; BUREAU OF SOLID WASTE AND RECYCLING; MICHAEL J.
DEVANEY, MANAGER OF SOLID WASTE AND RECYCLING; LANCASTER
COUNTY SOLID WASTE MANAGEMENT AUTHORITY; JAMES WARNER,
EXECUTIVE DIRECTOR OF THE LANCASTER COUNTY SOLID WASTE
MANAGEMENT AUTHORITY

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 07-cv-3545)
District Judge:  Hon. Joel H. Slomsky
_____

Submitted Under Third Circuit LAR 34.1(a)
November 16, 2012

Before:  SCIRICA, FISHER, and JORDAN, *Circuit Judges*.

(Filed: November 16, 2012)
_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Shell's Disposal and Recycling, Inc. ("Shell's Disposal" or "the Company") appeals a February 14, 2012 order by the United States District Court for the Eastern District of Pennsylvania denying its objections to and granting a motion to enforce a settlement agreement between it and the City of Lancaster. For the following reasons, we will affirm.

## I.     Background

Shell's Disposal has operated as a trash collection, waste disposal, and recycling business since 1976, and has been licensed to haul waste in Lancaster, Pennsylvania since 1990. As a licensed waste hauler, Shell's Disposal entered into contracts with residents and commercial establishments for the collection of their garbage. Those contracts were generally for a one-year term, and they automatically renewed absent action by the parties. By the time of the initiation of this action, Shell's Disposal had approximately 800 such contracts.

In September 2006, Lancaster's City Council passed an ordinance that altered the waste management procedures for the city. Specifically, the Ordinance converted Lancaster from a "multi-hauler" system of residential trash collection to a "single-hauler" system. (App. at 54.) Although the Ordinance provided that it did not "impair the obligations of any Existing Contract" (App. at 55), Shell's Disposal believed that the steps city officials took to begin implementing the Ordinance had that effect. The Company particularly objected to a brochure sent to residents explaining the new program, and to other interactions between city officials and citizens that it believed

2

prompted cancellations of its collection services. To remedy these concerns, on August 27, 2007, Shell's Disposal filed suit in the Eastern District of Pennsylvania against the City of Lancaster, its City Council, and various city officials (collectively, the "City"), asserting, *inter alia*, federal constitutional claims under 42 U.S.C. § 1983 and a variety of state law claims.[1]

After discovery and various pretrial motions, the District Court ordered on February 18, 2009, that the parties appear for mediation before Chief Magistrate Judge Carol Sandra Moore Wells. Judge Wells conducted several mediation sessions throughout 2009 and early 2010. Following a session on January 15, 2010, during which both parties were represented by counsel, Judge Wells determined that the parties had reached a settlement and issued an order marking the matter "SETTLED and CLOSED."[2] (App. at 112.) A Mutual Release and Settlement Agreement (the "Written Agreement") was subsequently drafted, which provided, in substantial part, that Shell's Disposal would (1) transfer its recycling business to another individual, (2) terminate all residential contracts with city residents by September 30, 2011, (3) abide by the provisions of the Ordinance, and (4) withdraw its federal lawsuit with prejudice. In exchange, the City would (1) forgive $4,500 in unpaid real estate taxes, (2) mark satisfied $12,000 in fines

---

[1] Shell's Disposal also filed a motion for a preliminary injunction on October 29, 2007. That motion was resolved on July 21, 2008, by a Stipulation to Settle due to agreement by the parties that "no circumstances exist requiring preliminary injunctive action by the Court." (App. at 38, 108.) The Stipulation Order also reflected the parties' agreement that "none of the Plaintiff's existing contracts are subject to being terminated … until at least 2011." (App. at 109.)

[2] The Order also established that the District Court "specifically retain[ed] jurisdiction to enforce the terms of the Settlement Agreement." (App. at 112.)

and costs imposed upon Shell's Disposal in other judicial proceedings with the City, (3) withdraw a pending contempt proceeding against the Company, (4) pay the Company's attorneys' fees and costs, (5) mark satisfied the Company's outstanding loan balance with the City of approximately $285,000, and (6) permit the Company to continue serving its residential customers through September 2011.

When presented with the Written Agreement on February 3, 2010, however, Willie Shell, Sr., the owner and representative of Shell's Disposal, refused to sign it, claiming to have never agreed to enter into a binding settlement agreement with the City. That refusal prompted the City to file a motion to enforce the settlement agreement (as embodied in the Written Agreement), and on May 28, 2010, Judge Wells held a hearing to address Mr. Shell's concerns about its enforcement. At that hearing, attorneys who had been present at the January 15 mediation session, including counsel for Mr. Shell,[3] testified that the parties had all understood that they had reached a binding settlement agreement at that session. The attorneys also testified that the subsequently drafted Written Agreement accurately reflected the terms of that settlement. In particular, Mr. Shell's attorney from the January 15 proceeding offered the following testimony:

> I sat through all the negotiations on January 15, 2010. My client agreed to the terms of the Settlement Agreement. We – afterwards we talked about it. We took a cab from the Courthouse … and at no time during that cab ride when we

---

[3] Mr. Shell terminated the services of that attorney and brought new counsel to represent the Company's interests at the May 28 proceeding. The prior attorney was still an attorney of record, however.

4

discussed the settlement was there any indication that the case was not settled.[4]

(App. at 132.)  Counsel for the City testified similarly, and Judge Wells's notes and recollection corroborated that testimony.  Judge Wells emphasized that she had "stated to [Mr. Shell] in no uncertain terms that if he had any complaints or issues to be negotiated, that was the time to do it, and that once we shook hands and had confirmed [the terms], it would be over."  (App. at 155.)  Mr. Shell did not directly dispute his attorney's or Judge Wells's statements, but insisted that he had never understood the agreement to be completely final and objected to some of its provisions.

Over Mr. Shell's objections, Judge Wells concluded that a binding settlement had been reached through an oral agreement on January 15, and that the Written Agreement accurately captured its terms.  She formalized those conclusions in a Memorandum Opinion and Order issued December 30, 2011, granting the City's motion to enforce the settlement agreement.  Shell's Disposal responded by filing a number of written objections with the District Court.  First, it asserted that Judge Wells overstepped her authority by issuing her December 30 order without the parties' consent, in violation of local rules and federal law.  The Company next argued that Judge Wells's order was unenforceable because the District Court lacked subject matter jurisdiction over the case,

---

[4] To the extent that Mr. Shell's conversation with his attorney was entitled to the protection of attorney-client privilege, that privilege was waived by the Company's failure to timely object to the attorney's testimony.  Fed. R. Evid. 103(a)(1).  Shell's Disposal admits that it failed to object to the evidence, but argues that it "was effectively without representation" during the May 28 hearing, and thus could not have waived the privilege by failing to object.  (Appellant's Br. at 33.)  That claim is false.  Shell's Disposal's new counsel appeared on its behalf at the hearing and certainly could have objected.

5

which had become purely a contract dispute governed by state law. Finally, it repeated the claim that Mr. Shell had never entered into a binding settlement agreement, calling the record demonstrating his agreement "flimsy and unreliable" (App. at 204), and the terms of the Written Agreement "illusory, indefinite and unenforceable" (*id.* at 205). Specifically, Shell's Disposal complained that the January 15 mediation session had not been transcribed, that its ex-attorney's testimony was not credible, that Judge Wells had still been requesting additional documentation during the so-called final settlement conference, that the details of the transfer of the Company's recycling business were left unspecified, and that the City's subsequent compliance with the terms of the Written Agreement did not constitute evidence of mutual agreement.

Due to these alleged defects, Shell's Disposal requested that the District Court conduct a *de novo* review of Judge Wells's order and "invalidate and set aside [her] findings that the parties entered into a Settlement Agreement." (*Id.* at 202, 207.) The Court conducted the requested review, denied the Company's objections, adopted all of Judge Wells's findings, and upheld her order granting the City's motion to enforce the settlement agreement.

On March 1, 2012, Shell's Disposal filed a motion for reconsideration of the District Court's order in light of ongoing proceedings in Bankruptcy Court. The Company had filed for Chapter 11 bankruptcy in 2009, and its counsel in the bankruptcy proceedings advised the District Court that "it [was their] position that the settlement agreement between the parties is rendered null and void" by provisions of the Bankruptcy

6

Code allowing the debtor-in-possession to reject executory contracts.  (App. at 24, 233.)

Shell's Disposal had not raised that argument at any prior point in the litigation.[5]

Before the District Court ruled on that motion, which was summarily denied,

Shell's Disposal filed this timely appeal of the February 14, 2012 order.

## II.    Jurisdiction and Standard of Review

We consider first whether, as Shell's Disposal argues, we lack subject matter

jurisdiction to enforce the settlement agreement.  The Company claims that Judge

Wells's January 15, 2010 order establishing that the parties had entered into a binding

settlement divested federal courts of jurisdiction by transforming the case into a purely

state law issue.[6]  The City disagrees, arguing that a district court has the inherent "power

to … enforce settlement agreements entered into with its approval" (Appellee's Br. at 16-

---

[5] On June 26, 2012, the Bankruptcy Court confirmed Shell's Disposal's
Plan of Reorganization.  That Plan includes the following provision:

> The United States District Court for the Eastern
> District Court of Pennsylvania has recently held that
> the Debtor-in-Possession entered into a voluntary
> settlement agreement with the City of Lancaster.  The
> Debtor-in-Possession disputes that but as part of this
> Amended Plan of Reorganization rejects pursuant to
> § 365 of the Bankruptcy Code any settlement
> agreement entered into with the City of Lancaster, and
> intends to proceed with litigation in the United States
> District Court or elsewhere.

(App. at 247.)

[6] It is, it seems, somewhat contradictory for Shell's Disposal to at once
argue both that this Court lacks jurisdiction because the parties entered into a
binding settlement and that this Court should deny the City's motion because no
agreement was in fact made, but that is the Company's line of attack.

7

17), and that, in any event, Judge Wells's January 15 order specifically retained jurisdiction for that purpose.

Shell's Disposal is of course correct that "[f]ederal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). Moreover, the Supreme Court has agreed that federal courts do not automatically have jurisdiction to enforce a settlement agreement simply because the agreement resolved underlying federal claims. *Id.* at 380-81 ("[T]he concept of limited federal jurisdiction [does not] permit[] us to assert[] ancillary jurisdiction over any agreement that has as part of its consideration the dismissal of a case before a federal court."). Generally, if a federal court dismissed the original action due to settlement of the claims, a later motion for enforcement of the settlement is purely a matter of state contract law, and the federal court must have "some independent basis for federal jurisdiction" to resolve the dispute. *Id.* at 382. Such an independent basis is not required, however, when a district court "embod[ied] the settlement contract in its dismissal order" or specifically retained jurisdiction over enforcement of the settlement. *Id.* at 381-82. In such situations, the district court may later entertain an action arising from the settlement agreement under its inherent authority to "manage its proceedings, vindicate its authority, and effectuate its decrees." *Id.* at 380.

Here, the District Court had jurisdiction over Shell's Disposal's original claims under 28 U.S.C. § 1331, and Judge Wells's January 15, 2010 order closing that case specifically retained jurisdiction for the purpose of enforcing the terms of the settlement agreement. The District Court therefore continued to have jurisdiction to address the City's motion to enforce that agreement, from which this appeal originated. We, in turn,

8

have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over the District Court's conclusions of law, and review that Court's findings of fact for clear error. *Covington v. Cont'l Gen. Tire, Inc.*, 381 F.3d 216, 218 (3d Cir. 2004); *Tiernan v. Devoe*, 923 F.2d 1024, 1031 (3d Cir. 1991).

## III.    Discussion

Beyond the jurisdictional question, Shell's Disposal suggests three reasons why the District Court erred in adopting Judge Wells's grant of the City's motion to enforce the settlement agreement. First, the Company argues that Judge Wells repeatedly acted beyond the scope of her authority, and thus the District Court illegally expanded her jurisdiction by enforcing her December 30, 2011 order. Second, it raises concerns about the underlying substance of Judge Wells's order, arguing that her finding that there was a binding settlement agreement was unsupported by law and fact. Third, it claims that the District Court should have reconsidered its holding in light of § 365 of the Bankruptcy Code, which allows a debtor-in-possession to reject certain contracts. 11 U.S.C. § 365. We address each of those arguments in turn.

### A.    *Scope of Judge Wells's Authority*

Federal law permits magistrate judges to perform a variety of functions on behalf of a district court. Most relevant to this case, 28 U.S.C. § 636(b)(1)(B) permits a magistrate judge to "conduct hearings, including evidentiary hearings, and to submit to a judge … proposed findings of fact and recommendations for the disposition" of a matter, even absent the consent of the parties. *See also* Fed. R. Civ. P. 72(b) (providing that a magistrate judge may conduct such proceedings "without the parties' consent"); *In re*

9

*U.S. Healthcare*, 159 F.3d 142, 145 (3d Cir. 1998) (same).[7] Unless the district court accepts those findings and recommendations, they do not have the force of law. *Cont'l Cas. Co. v. Dominick D'Andrea, Inc.*, 150 F.3d 245, 250 (3d Cir. 1998). Moreover, if any party files objections to the magistrate judge's findings and recommendations, the district court judge "shall make a *de novo* determination" of the disputed findings. 28 U.S.C. § 636(b)(1)(C). That *de novo* determination does not require that the district court conduct its own evidentiary hearing. *United States v. Raddatz*, 447 U.S. 667, 674 (1980). Rather, the district court is entitled to exercise its "sound judicial discretion" in determining how much to rely on a magistrate's proposed findings and recommendations. *Id.* at 676.

The process that the District Court and Chief Magistrate Judge Wells engaged in here comports with the requirements of 28 U.S.C. § 636(b)(1)(B). Judge Wells conducted a special evidentiary hearing on May 28, 2010, and, based on the evidence presented at that hearing, concluded that the parties had entered into a binding settlement agreement. Accordingly, she issued her December 30, 2011 order granting the City's motion to enforce the agreement. Shell's Disposal filed timely objections to that order with the District Court and obtained a *de novo* review of Judge Wells's findings. The District Court then adopted those findings and issued its own order enforcing the settlement agreement. Even if Judge Wells lacked the parties' consent to adjudicate the

---

[7] When the parties have provided consent, a magistrate judge's authority is broader. Under § 636(c)(1), a magistrate may conduct "any or all proceedings in a … civil matter and order the entry of judgment in the case" if the parties have previously consented to having a magistrate judge adjudicate their dispute. 28 U.S.C. § 636(c)(1).

motion to enforce – a fact that the parties dispute – the District Court formally adopted her findings after a *de novo* review of the record.[8] Therefore, the functions Judge Wells engaged in consisted of conducting an evidentiary hearing and submitting proposed findings and recommendations to the District Court. Under § 636(b)(1)(B), those functions do not require the consent of the parties, and Judge Wells did not exceed the scope of her authority.[9]

---

[8] Most of the parties' briefing on that issue addresses the presence or absence of consent. Consent is relevant when a magistrate judge rules on a dispositive pretrial motion, conducts trial proceedings, or enters a final judgment in a case. *See In re U.S. Healthcare*, 159 F.3d at 145. Shell's Disposal is correct that Judge Wells issued an order granting the motion to enforce the settlement, which, on its face, seemed to resolve the dispositive issue of whether a binding settlement agreement exists. If it had directly appealed that order, rather than filing objections with the District Court, Shell's Disposal may have had a meritorious claim that the order violates 28 U.S.C. § 636(b)(1)(A), which requires the parties' consent before a magistrate judge rules on a dispositive motion. *In re U.S. Healthcare*, 159 F.3d at 145. But the Company filed its objections with the District Court, and the Court conducted a *de novo* review of those findings, replacing the magistrate's conclusions with its own. Any procedural defect in Judge Wells's original order is thus harmless, and is not an appropriate ground for reversal. Fed. R. Civ. P. 61.

[9] To the extent that Shell's Disposal challenges Judge Wells's authority to issue the January 15, 2010 order closing the case, that claim is also unavailing. The Company had the right to appeal or file objections to that order, yet failed to do so. We have made clear that "in civil cases, the right to appeal the ruling of a magistrate judge is waived if reconsideration before the district court is not sought in a timely fashion." *United States v. Polishan*, 336 F.3d 234, 240 (3d Cir. 2003). Shell's Disposal did not formally object to the January 15, 2010 order until almost two years later, far exceeding the 14-day period in which to file timely objections, E.D. Pa. Civ. Rule 72.1, and the 30-day window for appeals, Fed. R. App. P. 4(a)(1)(A). It has thus waived any challenge to the January 15 order.

11

B.      *Factual and Legal Basis for Enforcing the Settlement Agreement*

Shell's Disposal next argues that the District Court erred in adopting factual findings and legal conclusions that were not adequately supported by law and fact. Specifically, the Company insists that there is insufficient evidence that Mr. Shell agreed to material terms of sufficient definiteness to support the conclusion that a binding settlement agreement was reached. The City disagrees, claiming that Mr. Shell personally entered into an agreement he understood to be binding, and that his subsequent disputes reflect a change of heart, not flaws in the underlying agreement.

The validity and enforceability of settlement agreements is governed by state contract law. *Am. Eagle Oufitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 582 (3d Cir. 2009); *Mazzella v. Koken*, 739 A.2d 531, 536 (Pa. 1999). Under Pennsylvania law,[10] "the test for enforceability of an agreement is whether both parties have manifested an intention to be bound by its terms and whether the terms are sufficiently definite to be specifically enforced." *Channel Home Ctrs. v. Grossman*, 795 F.2d 291, 298-99 (3d Cir. 1986). The first of those questions is factual in nature, and we review the District Court's factual determinations for clear error. *Tiernan*, 923 F.2d at 1031 n. 5. The second calls for a legal conclusion, which we review *de novo*. *Am. Eagle Outfitters*, 584 F.3d at 585; *Covington*, 381 F.3d at 218.

---

[10] We apply Pennsylvania law because all of the transactions leading to this litigation occurred in that state. *Tiernan*, 923 F.2d at 1033 ("the applicable law is that of the place with the most significant relationship to the parties and the transaction").

12

### 1. *Parties' Intention To Be Bound*

To have entered into a binding contract, the parties must have manifested an intention to be bound. *Channel Home Ctrs.*, 795 F.2d at 298-99. In assessing whether such intent was present, the inquiry is an objective one. If a party behaves in such a way that a reasonable person would apprehend that he intends to be bound by the terms of the agreement, that party's hidden subjective intent cannot overcome his outward manifestation of agreement. *Am. Eagle Outfitters*, 584 F.3d at 582.

The presence or absence of a signed writing is relevant to that determination, but is not dispositive. *Id.* at 584. If the parties have agreed to the essential terms of a contract, "the fact that they intend to formalize their agreement in writing but have not yet done so does not prevent enforcement of such agreement." *Mazzella*, 739 A.2d at 536; *see also Am. Eagle Outfitters*, 584 F.3d at 582 ("[P]arties may bind themselves contractually although they intend, at some later date, to draft a more formal document.") (quoting *Goldman v. McShain*, 247 A.2d 455, 459 (Pa. 1968)). On the other hand, merely engaging in negotiations, drafting preliminary documents, or agreeing "to enter into a binding contract in the future" does not create an enforceable contract "because the parties themselves have not come to an agreement on the essential terms of the bargain and therefore there is nothing for the court to enforce." *Am. Eagle Outfitters*, 584 F.3d at 582 (internal quotation marks omitted). The key inquiry is not the extent to which the parties have put their agreement in writing, but rather whether the parties agreed to the essential terms of a contract. *Mazzella*, 739 A.2d at 536.

Here, there is sufficient evidence that Mr. Shell, on behalf of Shell's Disposal, agreed to the terms of the settlement agreement on January 15, 2010. In addition to Judge Wells's notes describing the agreement, Mr. Shell's own attorney testified that his client left the January 15 mediation session with the understanding that a settlement had been reached. In fact, Mr. Shell has never expressly denied that he orally agreed to the terms as documented in the Written Agreement, or that Judge Wells explained that his agreement would constitute a binding settlement. Mr. Shell instead maintains that he expressed "concerns" about the provisions of the Agreement (Appellant's Opening Br. at 11), that he did not agree "to settle the matter" (*id.*), and that "no documents or evidence" exist establishing that he agreed to the proposed terms (*id.* at 30). He carefully avoids claiming that his attorney and Judge Wells are incorrect in saying that he verbally manifested his assent to each of the terms documented in the Written Agreement, instead attacking the credibility of his attorney, emphasizing the absence of a signed writing, and noting deficiencies in the record. In its *de novo* review of the record, the District Court considered those concerns, but nonetheless concluded that Mr. Shell had agreed to the settlement. Given that there is uncontradicted evidence supporting that conclusion, we cannot say that it is clearly erroneous. *See United States v. Igbonwa*, 120 F.3d 437, 441 (3d Cir. 1997) ("[W]hen the district court's decision is based on testimony that is coherent and plausible, not internally inconsistent and not contradicted by external evidence, there can almost never be a finding of clear error.") (citing *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985)).

14

## 2. *Ambiguity of the Settlement Terms*

Even when there is evidence of mutual assent, a settlement agreement does not constitute an enforceable contract if there are "ambiguities and undetermined matters which render [the] settlement agreement impossible to understand and enforce." *Mazzella*, 739 A.2d at 537 (internal quotation marks omitted). To be enforceable, an agreement must be certain about "the nature and extent of its obligation[s]." *Am. Eagle Outfitters*, 584 F.3d at 585. That requirement does not mean that the presence of any interpretive ambiguity renders an agreement unenforceable. *Id.* at 585-86. Rather, a contract fails for indefiniteness when it is "impossible to understand" what the parties agreed to because the essential terms are ambiguous or poorly defined. *Id.* at 586. For example, the Pennsylvania Supreme Court has held that an agreement was unenforceable when the parties failed to even discuss terms like price and manner of performance, *Lombardo v. Gasparini Excavating Co.*, 123 A.2d 663, 666 (Pa. 1956), and when the parties exchanged draft agreements that differed dramatically on the essential terms, *Mazella*, 739 A.2d at 537-38.

Shell's Disposal argues that even presuming that Mr. Shell agreed to the terms of the Written Agreement, the settlement cannot be enforced because "[t]here are several material terms that remain[] open and undecided." (Appellant's Opening Br. at 28.) The only ambiguity that the Company specifically identifies in its briefing, however, relates to the transfer of its recycling business. According to Shell's Disposal, the parties' failure to establish who would take ownership of that business creates an indefinite material term that prevents enforcement of the agreement. The City does not respond to that claim in

15

its briefing, but during the May 28, 2010 hearing its attorney argued that Mr. Shell's agreement to transfer operations of the recycling business "was the core issue that changed the City's position about being willing to talk settlement." (App. at 194.) Therefore, the issue we must resolve is not whether that term is material, which both parties have conceded, but whether it is sufficiently definite to be enforceable.

As captured in the Written Agreement, the disputed term states that "Shell agrees to cease operating [its] recycling business and to transfer the business to another individual as soon as said transfer can be effectuated, hopefully in 60 to 90 days, but in no event later than 120 days from the date of this Settlement Agreement."[11] (App. at 121.) Although that provision does not specify who will take ownership and on what conditions, that ambiguity goes to the details of performance, not to the "nature and extent of [the parties'] obligation[s]." *Am. Eagle Outfitters*, 584 F.3d at 585. The parties were not bargaining for the transfer of the business to a particular individual. Rather, the City wanted to ensure that Mr. Shell would no longer be the person managing the recycling center, a condition the parties viewed as essential to the resolution of their overall dispute.[12] That obligation is clear and enforceable from the terms of the Written Agreement. Whom the recycling business is transferred to is not a material term here, as

---

[11] We examine the terms of the Written Agreement even though the actual settlement agreement was reached orally because no party disputes that the Written Agreement reflects the terms discussed during the oral agreement.

[12] Mr. Shell's management of the recycling center was apparently unrelated to the City's shift to a single-hauler trash collection system, but it was nonetheless a source of tension between the parties and was addressed in their agreement along with the rest of their disputes.

it would be if one were considering an agreement for the actual sale of the business. Mr. Shell and his Company have maximum flexibility in satisfying this provision of the Written Agreement, subject only, it appears, to the limitation that the transfer not be a sham that leaves Mr. Shell involved in the business. Therefore, the District Court did not err in adopting Judge Wells's conclusion that the settlement terms agreed to by the parties constitute a binding, enforceable contract.

C.    *Effect of § 365 of the Bankruptcy Code*

Finally, Shell's Disposal argues that the District Court erred by failing to reconsider its decision in light of § 365 of the Bankruptcy Code, which allows a debtor-in-possession to reject its executory contracts. 11 U.S.C. § 365. The City challenges that assertion, arguing that the settlement agreement is not an executory contract, and that the agreement's obligations remain even if rejected. We need not address the City's response, however, because even presuming that Shell's Disposal is correct that the contract is executory, that argument is not an appropriate basis for reversal, for two reasons.

First, the District Court properly rejected that argument in its denial of the Company's March 1, 2012 motion for reconsideration, a decision we review for abuse of discretion. *North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1203 (3d Cir. 1995). We have made clear that a motion for reconsideration must be based on at least one of the following grounds: "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not [previously] available …; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Cafe*

17

*ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). Shell's Disposal has been in bankruptcy proceedings during the entire course of this litigation, and thus had ample opportunity to raise its bankruptcy argument prior to a motion for reconsideration. *See id.* at 678 (noting that "[c]ourts often take a dim view of issues raised for the first time in post-judgment motions") (internal quotation marks omitted). The Company points to no new law, no new evidence, and no "clear error" warranting reconsideration of the District Court's order. That Court therefore did not abuse its discretion by denying the Company's motion.

More fundamentally, the question of whether a contract is executory arises only if an enforceable contract exists. It is that preliminary question – and only that question – that we are called upon to resolve today. Any subsequent disputes regarding the ability of the debtor-in-possession to reject that contract may be raised in the appropriate forum at an appropriate time, but they are not properly before us on this appeal.

## IV.    Conclusion

For the foregoing reasons, we will affirm the District Court's denial of Shell's Disposal's objections and its grant of the City's motion to enforce the settlement agreement.

18